IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 11, 2008

Charles R. Fulbruge III
Clerk

No. 06-20095

STROMAN REALTY, INC.

Plaintiff-Appellant

v.

SAM WERCINSKI,
Commissioner of the Department of Real Estate for the State of Arizona

Defendant-Appellee.

Appeal from the United States District Court for the
Southern District of Texas

Before JONES, Chief Judge, and WIENER and BARKSDALE, Circuit Judges.

EDITH H. JONES, Chief Judge:

Stroman Realty, Inc. ("Stroman"), a Texas-based company, sought relief in a Texas federal court from attempts by the Commissioner of the Arizona Department of Real Estate to exercise regulatory authority over Stroman's timeshare sales business. The district court dismissed its action, which alleged violations of the Commerce Clause under 42 U.S.C. § 1983. Because the federal district court in Texas lacked personal jurisdiction over the defendant, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Stroman is one of the nation's largest advertisers and resale brokers of timeshare intervals in the secondary resale market. It advertises properties to individuals interested in either selling their timeshare interests or purchasing

timeshares from a previous owner other than the vacation resorts or condominium developers. Stroman's sole place of business is located in Conroe, Texas. Its brokers are licensed by the Texas Real Estate Commission, and the advertising and marketing agreements they negotiate with Stroman's clients are governed by Texas law.

Because most timeshare buyers do not live in the state in which their desired property is located, Stroman advertises in national newspapers, trade magazines, through direct-mail publications, and over the Internet. Prospective purchasers can search Stroman's website for availabilities at condominiums, resorts, or spas, and read about the occupancy conditions of the various timeshare intervals being offered. Interested parties then submit bids through the website or call a Stroman broker. Stroman uses its computer database to match prospective buyers with such variables as location, price range, amenities, and use interval. Prospective sellers are required to pay a one-time $489.00 "advance advertising fee" to register their timeshares with Stroman's Internet database, and, upon sale, the seller pays Stroman an additional $750.00 or 10% of the total sale price — whichever is greater — as commission. Often, the seller, prospective buyer, and timeshare property involved in a single deal are all located in different states. It would thus not be unusual for Stroman to broker a transaction involving a Texas buyer and an Arizona seller of a two-week timeshare interval at a Hawaii resort.

In January 2000, Elaine Richardson, Commissioner of the Arizona Department of Real Estate ("Commissioner"),[1] sent Stroman by certified mail a Cease-and-Desist Order ("Order") stating that Stroman's agents were not licensed as real estate brokers or salespeople in Arizona. Under Arizona law,

---

[1] Sam Wercinski, who replaced Elaine Richardson as Commissioner on January 11, 2007, is automatically substituted as the Defendant-Appellee in this matter. See FED. R. CIV. P. 25(d)(1).

nonresident brokers and other real estate service providers who transact business involving either Arizona citizens or real property located in Arizona must be licensed by the Commissioner whether or not the timeshare property the Arizona citizen wishes to buy or sell is located in Arizona. See ARIZ. REV. STAT. §§ 32-2101(47)(b)–(j); 32-2125.02. Nonresident brokers like Stroman are subject to various administrative and record-keeping requirements, such as maintaining in-state escrow accounts, hard copies of earnest-money receipts, closing statements, and other business records. See, e.g., id. §§ 32-2125.02, 32-2151.01. Unlicensed brokering of transactions involving Arizona real property or timeshares is a "Class 6 felony," punishable by fine or up to two years' imprisonment. See id. § 32-2165(A).

The Commissioner's Order maintained that Stroman and its agents were engaging in unlicensed timeshare resale brokering and ordered Stroman to cease "all contact with Arizona resident and non-resident owners of real estate located in Arizona . . . by mail, telephone, telefax, computer modem or any other means" until it complied with Arizona's licensing laws.[2] Additionally, Stroman was

---

[2] In support of the Order, the Commissioner referenced five unlicensed timeshare resale transactions involving Stroman and Arizona residents or real property:

1. An Arizona timeshare broker filed a complaint averring that he received an advertisement from Stroman, in violation of Arizona law, soliciting the sale of his Arizona timeshare interests stating: "Dear All Seasons Resorts Inc Would (sic) you be willing to sell your Timeshare Property for cash? Call Today: TOLL FREE 1-800-829-1544";

2. A Stroman agent drafted contracts on behalf of Arizona resident-sellers for purchase of two Sedona, Arizona, timeshare intervals. The sellers learned about Stroman through direct-mail and via the Internet;

3. An Arizona resident filed a complaint stating that he paid Stroman a $489.00 advertising fee and entered into a listing agreement for the sale of a Las Vegas, Nevada, timeshare interval, but that Stroman failed to provide him with any examples of advertisements or prospects for the resale of the timeshare;

4. An Arizona resident contracted with Stroman and paid a $489.00 advertising fee for sale of her Olympic Village, California, timeshare and paid two more $489.00 fees for listings of two Vail, Colorado, timeshares, but that since listing with Stroman she has heard nothing about the status of the properties;

5. An Arizona resident informed the Department that she had received "many"

instructed to refund "all monies solicited from Arizona resident and non-resident owners of real estate" received in the course of Stroman's allegedly illicit brokerage transactions. The Order stated that Stroman had the right to invoke an administrative review procedure and that failure to file a notice of appeal within thirty days of service of process would constitute waiver of any future right to administrative or judicial appeal. See id. § 41-1092. Stroman did not respond. Pursuant to Arizona law, the Order thus became a final, non-appealable, administrative decision. See id. § 12-902(B).

For five years, the Commissioner took no action, and Stroman — undeterred by the Order — continued to broker transactions involving Arizona timeshares and residents. In March 2005, however, the Commissioner contacted Stroman by mail, ordering anew that it cease its Arizona-related brokerage activities. This time around, the Commissioner added a charge that Arizona real-estate law forbade advertisement of Arizona properties on Stroman's Internet website. See id. § 32-2163(D). In response, on April 8, 2005, Stroman filed a complaint in the Southern District of Texas seeking declaratory and injunctive relief against the Commissioner under 42 U.S.C. § 1983, alleging that Arizona's attempted exercise of regulatory jurisdiction to license timeshare resales violated the Commerce Clause by discriminatorily and unduly burdening nonresident participation in the interstate secondary timeshare market.

The Commissioner then moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b), arguing that: (1) the Arizona administrative proceeding rendered Stroman's § 1983 claim res judicata; (2) the district court lacked personal jurisdiction over her; and (3) venue was improper. The Commissioner also moved for summary judgment on the statute of limitations. The district court granted the Commissioner's motion to dismiss based on claim preclusion

Stroman mailings soliciting resale of her Scottsdale, Arizona, timeshare.

and — raising the issue sua sponte — abstention under Burford v. Sun Oil Co., 319 U.S. 315 (1943). The district court did not address the other issues. Stroman has appealed.

## DISCUSSION

### Personal Jurisdiction

Why the district court failed to consider personal jurisdiction over the Commissioner in a Texas federal court is unclear. This court must do so.[3] Because the district court dismissed without the benefit of an evidentiary hearing, Stroman need make only a prima facie showing that jurisdiction is proper. Adams v. Unione Mediterranea Di Sicurta, 364 F.3d 646, 650 (5th Cir. 2004) (citation omitted). We accept as true Stroman's uncontroverted allegations and construe all record evidence in its favor. Id.

Because 42 U.S.C. § 1983 lacks a provision for service of process,[4] federal courts adopt state jurisdictional statutes to reach out-of-state defendants. See FED. R. CIV. P. 4(e), (k); Point Landing, Inc. v. Omni Capital Int'l, Ltd., 795 F.2d 415, 419 (5th Cir. 1986), aff'd sub nom. Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97 (1987). The Texas long-arm statute is coextensive with the federal constitutional limits of due process and normally generates an inquiry limited to the scope of the Fourteenth Amendment's Due Process Clause. See Religious Tech. Ctr. v. Liebreich, 339 F.3d 369, 373 (5th Cir. 2003). But where, as here, the case involves a challenge to an out-of-state regulator's enforcement of her state's statute, rather than a conventional contract or tort claim, it is

---

[3] Because we hold that the court lacked personal jurisdiction over the Commissioner, we decline to reach the other issues argued on appeal. See FED. R. CIV. P. 12(b)(4) (lack of personal jurisdiction over defendant allows case to be dismissed).

[4] See 42 U.S.C. § 1983; DeMelo v. Toche Marine, Inc., 711 F.2d 1260, 1269 (5th Cir. 1983).

useful to consider first whether the Texas long-arm statute reaches the Commissioner.

A.    Texas long-arm statute

Pertinent here, the Texas long-arm statute states:

In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

> (1)    contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; [or]

> (2)    commits a tort in whole or in part in this state; . . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. "'[N]onresident' includes: (1) an individual who is not a resident of this state; and (2) a foreign corporation, joint-stock company, association, or partnership." TEX. CIV. PRAC. & REM. CODE ANN. § 17.041.

One question arising from this language is whether the Commissioner, sued under the fiction created by Ex Parte Young, 209 U.S. 123 (1908), is an "individual" defendant within the terms of the statute. Ex Parte Young subjects a state employee acting in her official capacity to suits for prospective relief that avoid the Eleventh Amendment bar, but the employee's conduct remains state action under the Fourteenth Amendment. 17A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4231 (3d ed. 2004); see also Home Tel. & Tel. Co. v. Los Angeles, 227 U.S. 278, 287-88 (1913). Although the Commissioner is an "individual," she is acting in and was sued in her official capacity for enforcing Arizona statutes. Whatever may be the case for § 1983 suits against sister-state officials who are sued in their individual capacity, the Texas statute offers no obvious rationale for including nonresident individuals sued solely in their official capacity under Ex Parte Young. Moreover, the only other class of nonresident defined by the statute includes business entities but

6

not fellow states. Whether the long-arm statute's definition of nonresidents ignores or subsumes the Ex Parte Young fiction is uncertain.

A second statutory question is whether the Commissioner's enforcement of Arizona regulations constitutes "doing business," making a contract, or committing a tort — the activities reached by the long-arm statute. The parties, pursuing a commonly used broad analogy between § 1983 suits and torts, characterize this suit as a tort claim. It is one thing to appropriate statutes of limitation and damage measures from tort causes of action into § 1983; these are practical, utilitarian decisions. It also seems normally accurate to describe as torts, even under the long-arm statute, § 1983 suits against public officials for individual misconduct. But the claim here is against the Commissioner in her official capacity, the essence of Ex Parte Young.[5] The parties may casually describe this case as a tort, even though it challenges not the Commissioner's abuse of power but her faithful enforcement of allegedly unconstitutional Arizona statutes, and it seeks not damages but an injunction against the statute's operation. This court, however, interpreted similar official conduct as the "business" of state regulation. See Great W. United Corp. v. Kidwell, 577 F.2d 1256, 1268 (5th Cir. 1978), rev'd on other grounds sub nom. Leroy v. Great W. United Corp., 443 U.S. 173 (1979).[6] These two competing approaches suggest that only by twisting the ordinary meaning of the terms covered by the long-arm statute is Arizona's regulatory activity intended to be encompassed and adjudicated in Texas courts.

---

[5] See Erwin Chemerinsky, Federal Jurisdiction § 7.5.1 (4th ed. 2003) (describing Young).

[6] Although the Texas Supreme Court supports an expansive construction of "doing business," it connects acts relevant to the long-arm statute with a "business enterprise." Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990). And a "business" is in common usage a "commercial enterprise carried on for profit." Black's Law Dictionary 211 (8th ed. 2004). Arizona's regulatory activity in no way meets this definition.

By conceding the application of the "tort" provision of the long-arm statute, the Commissioner relieves this court of an obligation to pursue these interpretive questions. We preserve them for posterity, noting that while there may be no constitutional impediment against Texas's decision to allow its courts to construe and perhaps overturn state officials' enforcement of sister state statutes,[7] and while the long-arm statute is coextensive with the limits of procedural due process for those people and entities and activities that it describes, the legislature may not have opened the courthouse doors to include this case.

B.    Due Process

Whether or not the Texas long-arm statute encompasses extraterritorial regulation by a nonresident state official, we hold that exercising personal jurisdiction over the Commissioner in the Southern District of Texas would violate due process.[8] The Due Process Clause of the Fourteenth Amendment prohibits the exercise of personal jurisdiction over a non-resident defendant unless the defendant has meaningful "contacts, ties, or relations" with the forum state. Int'l Shoe Co. v. Wash., 326 U.S. 310, 319 (1945). Jurisdiction may be general or specific. Where a defendant has "continuous and systematic general business contacts" with the forum state, Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984), the court may exercise "general" jurisdiction over any action brought against that defendant. Id. at 415 n.9. Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with

---

[7] See Nevada v. Hall, 440 U.S. 410 (1979) (no constitutional impediment to a suit for damages against the State of Nevada being litigated in California court).

[8] But cf. Stroman Realty, Inc. v. Antt, 20 F. Supp. 2d 1050 (S.D. Tex. 1998) (holding that Texas court's exercise of general jurisdiction over Florida and California state officials did not violate due process because each state had a revenue office in Texas).

the forum." Id. at 414 n.8. This case presents only the question of specific jurisdiction.

The constitutional requirement for specific jurisdiction is that the defendant has "minimum contacts" with the forum state such that imposing a judgment would not "offend traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316. In Nuovo Pignone, SpA v. STORMAN ASIA M/V, 310 F.3d 374 (5th Cir. 2002), this court explained that the personal jurisdiction inquiry involves a three-step analysis:

> (1) whether the defendant . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

Id. at 378 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)).

### 1. Minimum Contacts

To determine whether the Commissioner has "minimum contacts" with Texas, we must identify some act whereby she "purposefully avail[ed] [her]self of the privilege of conducting activities [there], thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). The Commissioner's conduct must show that she "reasonably anticipate[ed] being haled into court" in Texas. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

Here, the totality of the Commissioner's contacts with Texas involves a cease and desist order and correspondence with Stroman's attorneys. Although the Commissioner has "reached out"[9] to assert her authority over Stroman's Arizona-related business activities, she has not "purposefully availed" herself of

---

[9] See Burger King, 471 U.S. at 479-80 (holding that defendant "reached out" beyond Michigan and made a contact with Florida when he negotiated a franchise contract with Burger King, a Florida corporation).

the benefits of Texas law like someone actually "doing business" in Texas. Hanson, 357 U.S. at 253. Stroman does not allege the Commissioner has made any contacts with Texas apart from hypothetical contacts she may make with other prospective timeshare vendors while attempting to assert "nationwide" authority. Based on such minimal known contacts, the Commissioner, a nonresident state official, could not have reasonably anticipated being haled into federal court in Texas to defend her enforcement of the Arizona statute. World-Wide Volkswagen, 444 U.S. at 297.

Courts generally exercise specific jurisdiction over nonresident defendants that are engaged in commercial, profit-oriented enterprise. In Kulko v. Superior Court, 436 U.S. 84 (1978),[10] the Supreme Court recognized that the absence of "commercial transactions in interstate commerce" in which a defendant "sought a commercial benefit" precluded an analogy to commercial activity cases as a basis for assertion of personal jurisdiction. Id. at 97. The Kulko Court further concluded that a court's reliance on a defendant's "having caused an 'effect' in [the forum state] was misplaced" because the defendant derived no benefit from any activities relating to the forum. Id. at 96. See also City of Va. Beach v. Roanoke River Basin Ass'n, 776 F.2d 484, 488 (4th Cir. 1985) (holding that the Governor of North Carolina's participation in hearings conducted in Virginia by the Army Corps of Engineers related to a dispute with a Virginia city was not an invocation of benefits and protections of Virginia law sufficient to subject governor to service under Virginia's long-arm statute).

---

[10] In Kulko, the Court held that California courts did not have personal jurisdiction in a domestic-relations case over a New York father who agreed to let his daughter live in California with her mother during the school year. Kulko, 436 U.S. at 94 ("A father who agrees, in the interests of family harmony and his children's preferences, to allow them to spend more time in California than was required under a separation agreement can hardly be said to have 'purposefully availed himself' of the 'benefits and protections' of California's laws.").

Kulko is applicable here. In the first instance, the Commissioner was not engaged in commercial transactions to obtain a commercial benefit by acting in a governmental capacity to enforce Arizona law. Because no such benefit accrues to the Commissioner from her activities relating to Texas, any jurisdiction based upon her having caused an "effect" in Texas is likewise misplaced. Even if the State of Arizona itself — as a sovereign state, subject to Eleventh Amendment protections — derived a benefit from any "effects" in Texas generated by the action of the Commissioner, the benefit does not run to those officials in their individual capacity, stripped of their sovereign immunity cloak. Stroman cannot have it both ways under the Ex Parte Young doctrine.

Stroman argues that because this is a case involving an out-of-state defendant's conduct targeted to affect an in-state plaintiff, this circuit's jurisdictional analysis is controlled by Calder's "effects test." See Calder v. Jones, 465 U.S. 783, 788 (1984); see also Southmark Corp. v. Life Investors, Inc., 851 F.2d 763, 771-73 (5th Cir. 1988). Calder involved a California actress who brought suit in California state court against two Florida employees of a tabloid magazine and alleged she had been libeled by a story featured in their publication. Upholding the California court's jurisdiction over the Florida defendants, the Supreme Court stated that the "effects" of their tortious conduct were "expressly aimed" at California and that the plaintiff would feel the "brunt of the harm" in that state. Calder, 465 U.S. at 789.

Stroman argues that Texas is a similar locus for jurisdiction because the effects of the Commissioner's regulatory actions are felt there. We do not agree. Although it may be true that the Commissioner's action against Stroman is based upon conduct which occurred entirely in Texas, we cannot find, as Stroman urges, that the Commissioner has purposefully directed her conduct at Texas. Stroman more accurately recognizes that the Commissioner, by proceeding with the cease and desist order, is essentially asserting nationwide

authority over any real estate transactions involving Arizona residents or property.

"Effects" jurisdiction is premised on the idea that an act done outside a state that has consequences or effects within the forum state can suffice as a basis for personal jurisdiction if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct. Moncrief Oil Int'l Inc. v. OAO Gazprom, 481 F.3d 309, 314 (5th Cir. 2007). Such jurisdiction is rare. Id. Moreover, as this court has noted, "[T]he key to Calder is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum." Allred v. Moore & Peterson, 117 F.3d 278, 286 (5th Cir. 1997), cert. denied, 522 U.S. 1048 (1998) (emphasis added) (quoting Wallace v. Herron, 778 F.2d 391, 395 (7th Cir. 1985), cert. denied, 475 U.S. 1122 (1986)). We have declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident. Moncrief, supra; see also Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 870 (5th Cir. 2001). By seeking to regulate Stroman's activities involving Arizona residents or property, the Commissioner is not "expressly aim[ing]" her actions at Texas. Calder, 465 U.S. at 789. Rather, her intent is to uphold and enforce the laws of Arizona.

To illustrate, this case closely resembles United States v. Ferrara, 54 F.3d 825 (D.C. Cir. 1995). In Ferrara, the federal government sued the Chief Counsel of the Disciplinary Board of the New Mexico Supreme Court in federal court in the District of Columbia ("D.C.") for injunctive relief after she charged an assistant United States attorney ("AUSA") with violating New Mexico's rules of professional conduct based on his employment-related activities in D.C. The government, relying on Calder, argued that the federal court in D.C. had jurisdiction because the New Mexico official's actions would have a "direct effect" on prosecutions in D.C., and the official created "continuing obligations" between

12

herself and D.C. due to ongoing licensing obligations. Id. at 828. The appellate court rejected this argument, concluding that a preexisting relationship between New Mexico and the AUSA forbade jurisdiction because the official was simply fulfilling her duty to uphold the New Mexico Bar's ethical standards, rather than reaching out to affect ethical standards in D.C. Id. at 829-30.

Likewise, the Arizona licensing regulations in force when Stroman chose to deal in Arizona timeshares and with Arizona residents preclude a finding of personal jurisdiction in Texas. Like the New Mexico official in Ferrara, the Commissioner is upholding professional standards for real-estate brokers in Arizona. Moreover, the connection Stroman seeks to establish between the Commissioner and Texas is based entirely on the unilateral actions and decisions of Stroman, not the Commissioner. In general, "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." Hanson, 357 U.S. at 253. Here, it was Stroman who chose to market Arizona properties and transact business with Arizona residents. Arizona is simply attempting to uniformly apply its laws. If the court adopted the approach urged by Stroman, we would endorse an interpretation of personal jurisdiction under which the Commissioner — and, for that matter, any state official seeking to enforce her state's laws — could potentially be subjected to suit in any state where the validity of her state's laws were in question. We are unwilling to establish such a broad principle.

2.    Cause of Action "Arises From" Forum-related Contacts

The second criterion for constitutionally sufficient contacts is that the underlying cause of action must "arise out of" the defendant's contacts with the forum state. The proper focus of the personal-jurisdiction analysis is on the "relationship among the defendant, the forum, and the litigation." Calder, 465 U.S. at 788 (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)). There is no

question that the underlying cause of action "arises" out of the Commissioner's cease and desist order to Stroman in Texas. But keeping in mind the proper focus on the relationship among the defendant, the forum, and the litigation, we observe that the Commissioner's connection to Texas is based on Stroman's conduct, whose "effects" were targeted at Arizona and its citizens. It could be said that the Commissioner was forced to come to Texas. On balance, however, this factor weighs in favor of Stroman.

### 3. Reasonableness of Personal Jurisdiction

The third element of the due process inquiry, assessing the reasonableness of a court's exercise of personal jurisdiction, includes five factors: (1) the burden upon the nonresident defendant to litigate in that forum; (2) the forum state's interests in the matter; (3) the plaintiff's interest in securing relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the several states' shared interest in furthering substantive social policies. See Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033 (1987); Felch v. Transportes Lar-Mex SA De CV, 92 F.3d 320, 324 (5th Cir. 1996).

Allowing the Southern District of Texas to assert jurisdiction over the Commissioner creates the possibility that the Commissioner will have to defend her attempt to enforce Arizona laws in courts throughout the nation. When a state defends its laws in a faraway forum, it loses the benefit of having the laws examined by local state or federal courts — courts that have special expertise interpreting its laws. See, e.g., Leroy v. Great W. United Corp., 443 U.S. 173, 186 (1979) ("[F]ederal judges sitting in Idaho are better qualified to construe Idaho law, and to assess the character of Idaho's probable enforcement of that law, than are judges sitting elsewhere."). Conversely, although a Texas court certainly has an interest in determining the legitimacy of Texas statutes, states have "little interest in adjudicating disputes over other states' statutes." PTI,

14

Inc. v. Philip Morris, Inc., 100 F. Supp. 2d 1179, 1189 n.8 (C.D. Cal. 2000). At the same time, Arizona, as a sovereign, has a strong interest in not having an out-of-state court evaluate the validity of its laws.[11]

Although Stroman has an interest in a convenient forum to pursue litigation, especially when it alleges harm from a constitutional violation, and Texas has an interest in providing a forum to redress the grievances of its citizens, subjecting the Commissioner to suit in the Southern District of Texas could lead to a multiplicity of inconsistent verdicts on a significant constitutional issue. If, as is likely, these courts reside in different federal circuits, only the Supreme Court could sort out the confusion. But if the cause of action is litigated in Arizona federal court, judicial efficiency and uniformity prevail.

Important questions of federalism are present here, and thus, for this case, "the shared interest of the several states" is the most significant reasonableness consideration outlined by the Supreme Court. Federalism and state sovereignty are an essential part of the constraints that due process imposes upon personal jurisdiction. Those constraints do more than "protect[] the defendant against the burdens of litigating in a distant or inconvenient forum"; they also "ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." World-Wide Volkswagen, 444 U.S. at 292. "The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all of its sister States — a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." Id. at 293. Accordingly, "the reasonableness of asserting

---

[11] See, e.g., Omaha Tribe v. Barnett, 245 F. Supp. 2d 1049, 1055 (D. Neb. 2003) ("The fundamental sovereignty of these jurisdictions could be impinged if they are not permitted to determine in their states whether these statutes are constitutional. . . ."); PTI Inc., 100 F. Supp. 2d at 1189 n.8 (analyzing reasonableness of exercising personal jurisdiction over foreign state official and noting that "[t]he conflict with state sovereignty is perhaps the most compelling factor — requiring the states to submit to California jurisdiction constitutes an extreme impingement on state sovereignty").

jurisdiction over [a] defendant must be assessed in the context of our federal system of government." Id. (citation omitted). In that way, due process "act[s] as an instrument of interstate federalism." Id. at 294. The effect of holding that a federal district court in the Southern District of Texas had personal jurisdiction over a nonresident state official would create an avenue for challenging the validity of one state's laws in courts located in another state. This practice would greatly diminish the independence of the states.

In World-Wide Volkswagen, the Supreme Court cited increasing interstate commerce to justify relaxed personal jurisdiction standards. In spite of this conclusion, however, the Court emphasized that "we have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution." Id. at 293. We agree, and hold that it would be unreasonable to subject the Commissioner to suit in the Southern District of Texas.

This analysis would be incomplete without addressing this court's decision in Great W. United Corp. v. Kidwell, supra, a Fifth Circuit opinion barely mentioned in the briefs. Kidwell expressly found no due process violation in a Texas court's exercise of personal jurisdiction over an Idaho official who sought to enforce an Idaho corporate takeover statute against a Texas company. This result, we conclude, has been overturned by later Supreme Court decisions. Nevertheless, Kidwell exposes the novelty of Stroman's maneuver in this case. Kidwell itself was reversed by the Supreme Court on a finding of improper venue.[12] The Court expressly declined, under its then-existing precedent,[13] to

---

[12] See Leroy, 443 U.S. at 181.

[13] Leroy, 443 U.S. at 181 (pretermitting "unnecessary" decision of personal jurisdiction where lack of venue was "clear"); but see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93 (1998) (holding that federal court may not, via doctrine of "hypothetical jurisdiction," decide cause of action before resolving whether court has Article III jurisdiction).

reach the due process issues surrounding personal jurisdiction. If Kidwell's assumption of personal jurisdiction remained viable, this court would be bound notwithstanding the Supreme Court's reversal of the decision on other grounds. See Cent. Pines Land Co. v. United States, 274 F.3d 881, 894 (5th Cir. 2001) (stating that Fifth Circuit cases overruled on other grounds by the Supreme Court remain binding authority). Kidwell, however, stretched the law of minimum contacts in its own day, as a vigorous dissenting opinion explained,[14] and has become irreconcilable with subsequent Supreme Court decisions whose net result is to limit "effects"-based personal jurisdiction and insist upon tangible minimum contacts between a defendant and the forum state.

In Kidwell, the majority concluded the "[m]inimum contacts . . . need not arise from actual physical activity in the forum state; activities in other forums with foreseeable effects in the forum state will suffice." 577 F.2d at 1266-67. Hence, Idaho officials, by purporting to enforce Idaho law against a hostile takeover of an Idaho company by a Texas company, "foreseeably restrained" the Texas company from carrying out its plans. Id. at 1267. The court distinguished Kulko and minimized the significance of Hanson's requirement that a defendant purposefully avail itself of the privilege of doing business in a forum state. Id. at 1267-68. Finally, the court found a Texas court's assumption of jurisdiction reasonable in the due-process context because Idaho's officials, who cast a regulatory net for corporate transactions over the entire United States, could fairly expect to have to defend their policy in other states, and their regulation of Texas-based activities "provides the necessary contact[] with Texas." Id. at 1270.

Each of the components of Kidwell has been overtaken by later decisions. "Effects"-based jurisdiction was significantly cut back in Calder, and the

---

[14] See Kidwell, 577 F.2d at 1287-92 (Godbold, J., dissenting in part, concurring in part).

requirement for active minimum contacts with the forum state has been emphasized, contrary to Kidwell, in the Supreme Court's decision in World-Wide Volkswagen. Finally, despite its rough justice in exposing extraterritorial regulation by state officials to scrutiny in other affected states' courts, the Kidwell majority's reasonableness analysis confuses fairness with the merits of the case. See Kidwell, 577 F.2d at 1296 (Godbold, J., dissenting). And both Burger King and Asahi later outlined the factors to determine whether a court's exercise of jurisdiction is "reasonable," providing a more exacting test than this court applied in Kidwell. In the absence of minimum contacts, and in the presence of significant state sovereignty concerns, the ultimate fairness of the forum should not turn on who ought to prevail. The more nuanced approach toward fairness described in Burger King and Asahi is controlling.

## CONCLUSION

For these reasons, even if the Texas long-arm statute permits an assertion of jurisdiction over the Commissioner in her official capacity, the exercise of jurisdiction related to her dealings with Stroman would violate due process.

The district court's judgment of dismissal is AFFIRMED.

RHESA HAWKINS BARKSDALE, Circuit Judge, concurring in part:

Although I concur in holding personal jurisdiction is wanting because the requisite minimum contacts are lacking, I do not concur in the opinion's extensive dicta, including parts about: whether the Texas long-arm statute applies (part A), the parties having conceded it does; state officials being sued in their individual capacity (part B.1.), Richardson having been sued only in her official capacity; and either whether the claim arises out of minimum contacts (part B.2.) or the reasonableness of a court's exercise of personal jurisdiction (part B.3.), because, as noted, those contacts are lacking.

The opinion covers the proverbial waterfront; but, all that is required to decide this appeal is found in a very small portion of it. No authority really need be cited for the longstanding acknowledgment that courts, most especially federal courts, function best, and most properly, in their assigned, limited role when they decide an issue on its most narrow, necessary basis and do not engage in unwarranted exploration of areas best left for when it is absolutely necessary to venture there. E.g., Marshall v. Marshall, 547 U.S. 293, 315-16 (2006) (Stevens, J., concurring in part) (stating "obiter dicta – dicta that the Court now describes as redundant if not incoherent – generated both confusion and abdication") (citations omitted); Jama v. Immigration and Customs Enforcement 543 U.S. 335, 351 n.12 (2005) ("Dictum settles nothing, even in the court that utters it."); Ankenbrandt v. Richards, 504 U.S. 689, 717 n.* (1992) (Stevens, J., concurring in the judgment) ("An easy case is especially likely to make bad law when it is unnecessarily transformed into a hard case.").