REVISED April 21, 2009

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 30, 2009

Charles R. Fulbruge III
Clerk

No. 08-11224

BILLY J MULLINS JR; FARAWAY ENTERPRISES

Plaintiffs-Appellees-Cross-Appellants

v.

TESTAMERICA INC; SAGAPONACK PARTNERS LP

Defendants-Appellants-Cross-Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before KING, HIGGINBOTHAM, and WIENER, Circuit Judges.

KING, Circuit Judge:

In 1998, Plaintiff Billy Mullins sold all the assets of his company to Defendant TestAmerica, Inc. in exchange for cash and an unsecured promissory note payable to Mullins's company, renamed Faraway Enterprises. TestAmerica's obligation to pay the note was subordinated and subject to the prior payment in full of all of TestAmerica's "debt facilities." TestAmerica fell on hard times, winding up with approximately $50 million in debt. In 2003, TestAmerica sold all of its assets to a third party in exchange for $33.5 million. Secured and senior debt was paid, and at the direction of the secured creditor,

approximately $3 million due it was paid to retire part of TestAmerica's debt to Sagaponack Partners LP, the majority shareholder of TestAmerica. Faraway's note and the balance of Sagaponack's debt remain unpaid. Mullins and Faraway filed suit against TestAmerica claiming breach of contract and fraud and against TestAmerica and Sagaponack alleging a violation of the Texas Uniform Fraudulent Transfer Act. The jury found that the contract was breached, that TestAmerica defrauded Faraway, and that TestAmerica and Sagaponack violated TUFTA. The jury awarded no actual damages but imposed punitive damages against TestAmerica and Sagaponack. In large part, we reverse.

## I. Factual Background

### A. The 1998 sale of METCO to TestAmerica

Plaintiff Billy Mullins, a resident of Texas, owned Mullins Environmental Testing Co., Inc. ("METCO"), a Texas company that specialized in testing air from smokestacks. Early in 1998, Mullins began marketing his company to potential buyers. A business broker put Mullins in touch with TestAmerica, Inc. ("TestAmerica"), then known as Hydrologic, an environmental testing company based in North Carolina that was seeking to expand the scope of its business. Thomas Barr served as TestAmerica's President, as its CEO, and as one of five directors on its board. Of TestAmerica's four other directors, two—Barry Rosenstein and Defendant Marc Weisman ("Weisman")—were also limited partners in Sagaponack Partners LP ("Sagaponack"), a private equity group, a third was chosen by Barr from a slate of individuals proposed by Sagaponack, and the fourth was unaffiliated with Sagaponack.[1]

---

[1] Rosenstein also served as the managing member of Sagaponack's general partner, RSP Capital, LLC. Sagaponack's investment advisor was Sagaponack Management Company ("Sagaponack Management"), an entity unaffiliated with Sagaponack. Sagaponack Management also employed Weisman and contracted with Rosenstein for his consulting services.

On December 18, 1998, TestAmerica purchased METCO and two other companies. TestAmerica financed these acquisitions by issuing both debt and equity. First, Fleet Capital Corporation ("Fleet"), both as a lender and as agent for a syndicate of other lenders, agreed to make available to TestAmerica a "Total Credit Facility" of $37 million consisting of revolving credit loans, letters of credit, and term loans. These loans were secured by all of TestAmerica's assets. Key Mezzanine Capital, L.L.C. ("Key") and Regis Capital Partners, L.P. ("Regis") also provided a total of $7 million in mezzanine financing, a hybrid of debt and equity financing. By agreement, Fleet's loan had priority in right of payment over that of Key and Regis.

TestAmerica also issued three "amended and restated" promissory notes totaling $555,000, and three "earnout" promissory notes totaling $350,000 to Louis, Rami, and Firas Mishu (the "Mishus").[2] The Mishu notes were secured by approximately $2 million of equipment belonging to Geotek Drilling Company, Inc., one of TestAmerica's existing subsidiaries.

Sagaponack, under a "Second Securities Purchase and Loan Agreement," contributed $3,700,000 in cash and agreed to cancel two prior notes from January 13, 1998, in exchange for a bridge note of $3,000,000, a term note of $700,000, and a replacement note of $5,311,094. Sagaponack also received enough shares of TestAmerica's common stock to become the majority shareholder of TestAmerica. Significantly, the agreement included a change of control provision that prohibited TestAmerica from selling its assets without Sagaponack's approval.

Closing occurred at the offices of Fleet's attorneys in New York City. Mullins, who signed the documents in Texas and sent them to the closing,

---

[2] Apparently, the Mishus had sold all or part of Geotek to TestAmerica sometime earlier and held promissory notes issued by TestAmerica on August 7, 1997 in the total principal amount of $1,199,999.99.

executed five contracts with TestAmerica governing the sale of METCO: (1) an employment agreement under which Mullins would serve for three years as President of the new METCO entity, METCO Environmental, Inc. ("METCO Environmental") and receive a yearly salary of $150,000; (2) a non-compete agreement; (3) an asset purchase agreement (the "Purchase Agreement"); (4) an "8% subordinate convertible note" (the "Note"); and (5) a subordination agreement (the "Subordination Agreement"). After the sale of its assets, METCO changed its name to Faraway Enterprises ("Faraway"), a Texas corporation wholly owned and controlled by Mullins with its principal place of business in Texas. The parties' dispute centers around the payment and priority terms in the Note, Purchase Agreement, and Subordination Agreement (collectively, the "Agreements").

As required by the Purchase Agreement, TestAmerica paid Mullins $8.25 million in cash at closing. TestAmerica's obligation to pay the balance of the purchase price for METCO's assets was evidenced by the Note. Pursuant to a formula based on METCO Environmental's profits over the following three-year period, the Note's initial principal amount of $2 million would be adjusted to an amount between $1 million and $6.75 million. This calculation was to be provided to Faraway in a "Period Income Statement" within 90 days of December 31, 2001, i.e., on or before March 31, 2002. The Note also required TestAmerica to make annual interest payments of $160,000 starting on December 31, 2000, and three annual principal payments starting on December 31, 2001. Both the Note and Purchase Agreement included Texas choice of law provisions and provided for exclusive venue and jurisdiction in Dallas County, Texas.

Faraway's priority in payment in relation to TestAmerica's other creditors is defined by several provisions in the Agreements. According to the Purchase Agreement, the Note

shall be subordinated and subject in right of payment to the prior

4

payment by [TestAmerica] in full of all of [TestAmerica's] debt facilities. The indebtedness evidenced by the . . . Note shall be expressly subordinated to the extent and the manner set forth in the Subordination Agreement dated December 18, 1998 among TestAmerica Incorporated ("TAI"), Key Mezzanine Capital L.L.C. ("KMC"), Regis Capital Partners, L.P[.] ("Regis"), [and] Fleet Capital Corporation ("Fleet") . . . .[3]

The Subordination Agreement, which was drafted by the attorneys for Key and Regis, delineates two categories of creditors: (1) "Senior Creditors" Fleet, Key, and Regis (the "Senior Creditors"), and (2) "Subordinated Creditors," defined as "the parties signing below as Subordinated Creditors." During the course of litigation, the parties disputed which of two versions of the Subordination Agreement is the operative agreement. The day before closing, Mullins signed a copy of the agreement, which Mullins's counsel sent to TestAmerica's counsel in New York City. That document is labeled in the footer as "v.6" ("Version 6"), and the only signature reflected on the signature page is that of Mullins, as a "Subordinated Creditor." The version that surfaced later during the course of litigation, however, is identified in the footer as "v.7" ("Version 7"). The footer on the two signature pages to Version 7, however, indicates that they are from Version 6. The first of these pages includes the signatures of the Senior Creditors; Thomas Barr for TestAmerica; and, as a "Subordinated Creditor," Robert Juneja, the authorized signatory for Sagaponack. The second signature page contains only Mullins's signature.

---

[3] The Note contains similar language, except for an addition at the end of the first sentence that the Note

> shall be subordinated to the extent required by [TestAmerica] . . . and subject in right of payment to the prior payment in full of all of [TestAmerica's] debt facilities whether now existing or hereafter created.

(emphasis added). Since the priority dispute that this suit focuses on is between debts to Faraway and Sagaponack which were created on the same day, the provision of the Note which contemplates future debt facilities does not affect our decision.

According to Mullins, he neither authorized anyone to attach his signature to Version 7, nor anticipated that it would be so attached. Although several witnesses suggested that Version 7 was assembled by counsel to one of the lenders, at trial no one definitively identified the responsible lender.

Both versions of the Subordination Agreement establish the priority of TestAmerica's debts to the Senior Creditors ("Senior Debt") over all "Subordinated Debt" but permit certain payments on Subordinated Debt while the Senior Debt remains outstanding so long as other conditions within the agreement are satisfied:

2. <u>Subordinated Debt Subordinated to Senior Debt</u>

(a) Notwithstanding any contrary provisions of any instruments or agreements evidencing or relating to Subordinated Debt, [TestAmerica] covenants and agrees, and each holder of Subordinated Debt by its signature hereon likewise covenants and agrees, for the benefit of the holders from time to time of Senior Debt, that all payments of Obligations and Claims in respect of Subordinated Debt shall be subject and subordinate in right of payment . . . to the prior payment in full in cash of all Obligations in respect of (1) Designated Senior Debt [i.e., debt to Fleet] and (2) other Senior Debt. . . .

(b) Unless and until all Obligations in respect of the Senior Debt have been finally paid in full in cash, and subject to the provisions of this Agreement, including without limitation Section 3, 4, and 5, no direct or indirect payments shall be made on, under or with respect to any Obligations or Claims under, relating to or in respect of any Subordinated Debt except for the payments set forth as Permitted Schedule Payments on Exhibit 1 hereto.

"Subordinated Debt" is defined as "all Obligations under the Subordinated Debt Documents," which, in turn, means

all agreements . . . governing the indebtedness or other liabilities of

[TestAmerica] or any affiliate to each party signing below as a Subordinated Creditor, including without limitation those listed on Exhibit 1 hereto. Without limiting the generality of the foregoing, all agreements or other instruments between [TestAmerica] . . . and Sagaponack . . . shall be a Subordinated Debt Document.

(emphasis added). In Version 6, the only "Subordinated Creditor" listed in Exhibit 1 is METCO (i.e., Faraway), but the spaces provided for METCO's address, subordinated debt, permitted payments, and subordinated documents are blank. According to Mullins's attorney, he anticipated that TestAmerica's counsel would fill in this information. Exhibit 1 to Version 7, in contrast, provides the information missing from Version 6 but also includes payments for the bridge, term, and replacement notes to Sagaponack and for management fees to Sagaponack Management. According to TestAmerica's counsel, Key and Regis's attorneys most likely added Sagaponack and Sagaponack Management to Exhibit 1.

Both versions suspend TestAmerica's obligations to pay "Subordinated Debt" in the event that TestAmerica defaults on its obligations to the Senior Creditors, although the italicized words in the first sentence below are found only in Version 7:

4. <u>Subordination on Default in Senior Debt</u>.

No direct or indirect payments by or on behalf of [TestAmerica] shall be made on, under or with respect to any Obligations or Claims under, relating to or in respect of any Subordinated Debt . . . (a) if, at the time specified for such payment, (i) there exists . . . a default in the payment . . . of any Obligation in respect of Senior Debt or any other Default . . . of any kind or nature shall have occurred and be continuing under the Senior Debt Documents, whether or not a payment default, and (ii) [Fleet] and the other Senior Creditors shall not have delivered to the holders of Subordinated Debt a written notice of waiver to the benefits of this sentence and consent to the making of payments on Subordinated Debt . . . . In addition to the foregoing, the liability of [TestAmerica] to pay any Obligation or Claims under, relating to or in respect of

7

Subordinated Debt shall be suspended for the period specified below upon the occurrence of events or circumstances constituting a Default . . . under any instrument or agreement creating or evidencing any Senior Debt . . . and, during such suspension period, no default, event of default, breach or other right to payment shall arise or exist under the Subordinated Debt Documents, by reason of [TestAmerica's] failure to pay such suspended Subordinated Debt. The suspension period . . . shall commence upon the occurrence of events or circumstances constituting a Default . . . under . . . any Senior Debt and shall end upon the occurrence of a Proceeding or indefeasible payment in full of the Senior Debt. During such suspension period, [TestAmerica] shall not pay any Subordinated Debt, whether pursuant to the terms of the Subordinated Documents or otherwise, and, the holders of Subordinated Debt shall not . . . commence . . . any Proceeding, or take any action to demand or enforce payment of any Subordinated Debt. Immediately following the expiration of any such period of suspension, any Subordinated Debt which, but for such suspension, would have become and would then be due and payable shall become immediately due and payable subject to the provisions of this Agreement.

Under both versions of the agreement, a "Proceeding" means, in pertinent part:

(a) any insolvency, bankruptcy, receivership, liquidation, reorganization, readjustment, arrangement, composition or other similar proceeding relating to [TestAmerica], its property or its creditors . . . .

Finally, both versions also include the following, identical clauses:

7.      Subrogation

If any payment or distribution to which the holders of Subordinated Debt would otherwise have been entitled, but for the provisions of this Agreement, shall have been applied, pursuant to the provision of this Agreement, to the payment of Obligations in respect of Senior Debt, then and in such case following the final and indefeasible payment in full in cash of all Obligations and Claims in respect of Senior Debt, the holders of Subordinated Debt shall be subrogated to the rights of the holders of Senior Debt to receive payments or distributions of assets of [TestAmerica] and/or its subsidiaries made on such Senior Debt until all Subordinated Debt shall be paid in full . . . .

8

8.    Obligations of [TestAmerica] Unconditional

Nothing contained in this Agreement (a) is intended to or shall impair, as between [TestAmerica] and the holders of Subordinated Debt, the obligations of [TestAmerica], which are absolute and unconditional, to pay to the holders of Subordinated Debt all Obligations in respect of Subordinated Debt as and when the same shall become due and payable in accordance with their terms, or (b) is intended to or shall affect the relative rights of the holders of Subordinated Debt, on the one hand, the creditors of [TestAmerica] other than the holders of Senior Debt, on the other hand.

B.    TestAmerica's financial troubles

TestAmerica made only one payment on the Note: the first interest payment of $160,000, which it paid in January, 2000, after the December 31, 1999 due date.  By September, 2000, TestAmerica was in default of its obligations to the Senior Creditors, although it continued to make quarterly payments on its notes to the Mishus.  During this period, Fleet threatened to force TestAmerica into bankruptcy.

TestAmerica began seeking a buyer for METCO Environmental. According to testimony of Mullins at trial, Barr offered to sell the company back to Mullins, but Mullins balked at the asking price of $13 million.  Mullins, through Barr, learned that General Electric had offered to buy METCO Environmental for $10.5 million and had expressed an interest in having Mullins stay on to run the company.  Mullins offered to speak to General Electric to see if the company would be willing to assume the Note.  But, according to Mullins, Barr later informed him that Weisman refused to permit the company to be sold to General Electric if any money were to go to Mullins.

On February 14, 2001, some of TestAmerica's lenders, including Sagaponack, Key, and Mullins attended a meeting at Key's offices in Cleveland, Ohio.  Weisman, as a representative of Sagaponack, conducted the meeting and

informed the lenders of TestAmerica's default to Fleet and its ramifications. According to Weisman, he also discussed the hierarchy amongst the creditors and specifically told Mullins that he was at the bottom behind the Senior Creditors and Sagaponack.

Fleet and two other syndicate members entered into a forbearance agreement with TestAmerica in November, 2001. Based on TestAmerica's calculation of Mullins Environmental's average profits from 1999 through 2001 in a "Period Income Statement" faxed and sent to Mullins on April 1, 2002—one day after the prescribed deadline—the principal amount of the Note was to be $1,000,000. As will be seen infra, Mullins and Faraway disputed that amount.

C.    TestAmerica's sale to HIG

In mid-2002, TestAmerica accepted an offer from H.I.G. Capital, LLC ("HIG") to purchase substantially all of its assets for $33.5 million, an amount significantly less than TestAmerica's total outstanding debt of $50 million. TestAmerica's board of directors, which then consisted of Barr, Weisman, Rosenstein, and another director unaffiliated with Sagaponack, unanimously approved the sale to HIG.

The transaction closed on January 3, 2003, at the offices of HIG's counsel in New York City. The proceeds of the sale were allocated as follows. Key and Regis received $3,480,000 and $870,000, respectively—about $2 million less than the amount owed under their loans to TestAmerica. Several secured creditors, including the Mishus, were also paid in exchange for their release of security interests in various properties of TestAmerica or its subsidiaries.[4] As stated in a January 2, 2003 pay-off letter addressed to HIG, although Fleet was owed, and thus entitled to, $26,336,585.64 of the proceeds from the sale, it agreed to release its lien against TestAmerica's assets upon receiving a "Payoff Amount" of

---

[4] Those amounts were: (1) $305,428.94 and $203,623.03 to Louis and Rami Mishu, respectively; (2) $210,000 to Richard Alt; and (3) $771,718.35 to FINOVA Capital Corporation.

$23,133,785.64 that would constitute "payment in full" of TestAmerica's obligations. In that letter, Fleet directed that HIG pay directly to Sagaponack the remaining $3,202,800 which it would otherwise have been entitled to receive "[i]n consideration for (a) the consent of Sagaponack . . . to the Sale and (b) Sagaponack's agreement to cooperate and assist with certain post-closing matters arising from and in connection with the Sale . . . ." This transfer was negotiated by Weisman on Sagaponack's behalf. According to Weisman, Sagaponack also agreed to provide HIG the indemnifications and warranties that Fleet and Key would not.

HIG paid Sagaponack $2.3 million in cash and placed approximately $700,000 in escrow accounts to cover the wind-up expenses. Only $200,000 from those accounts has been disbursed to Sagaponack. To date, Sagaponack has not made any distributions to Weisman or any of its other limited partners from the funds received from HIG.

After the sale, TestAmerica changed its name to Asheville, Inc., and moved its headquarters from North Carolina to New York City. Weisman took over as President in charge of winding up the company's affairs, and he and Rosenstein served as the company's sole directors.

## II. Procedural History

On December 13, 2001, at the end of Mullins's three-year employment contract with METCO Environmental but more than two years before the HIG transaction, Mullins and Faraway ("Plaintiffs") filed suit in Texas state court against TestAmerica and Sagaponack, asserting state law claims for, among other things, breach of contract and fraud. Defendants removed on the basis of diversity jurisdiction, stating in their notice of removal that Plaintiffs are Texas citizens, that TestAmerica is a citizen of Delaware and of North Carolina—the states of its incorporation and principal place of business, respectively—and that Sagaponack "is a limited partnership existing under" and with its "principal

place of business" in New York and "is now and was at the time this action was commenced a citizen of the State of New York and of no other state."

Sagaponack promptly moved to dismiss for lack of personal jurisdiction pursuant to FED. R. CIV. P. 12(b)(2). The motion was granted on June 25, 2002, following an evidentiary hearing.

In June, 2003, Faraway and TestAmerica arbitrated their dispute over the principal amount of the Note. The arbitrator determined that amount to be $2,233,102.80, which was confirmed by the district court on November 14, 2003. It was around this period that Sagaponack and TestAmerica first disclosed Version 7 of the Subordination Agreement to Mullins.

Later that year, the instant suit was reassigned intra-district to a different judge. Shortly thereafter, the district court granted Plaintiffs leave to file a second amended complaint to assert new causes of action arising out of the sale of TestAmerica to HIG, to join numerous additional defendants—including Weisman—and to plead Sagaponack back into the suit.[5] In addition to realleging their breach of contract and fraud claims against TestAmerica, Plaintiffs, construing the Subordination Agreement to give them priority to payment behind the Senior Creditors and ahead of Sagaponack, asserted that Sagaponack's receipt of proceeds from the HIG transaction constituted a fraudulent transfer by Sagaponack, TestAmerica, and Weisman, in violation of TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) ("TUFTA"). TestAmerica asserted a counterclaim for breach of contract, alleging that Plaintiffs breached their obligations under the Subordination Agreement by filing suit during the suspension period, thereby affecting the sale price for METCO Environmental received by TestAmerica and causing TestAmerica to incur attorneys' fees.

---

[5] Other defendants, TestAmerica Environmental Services, L.L.C., Bank One, H.I.G. TestAmerica, Inc. (Cayman Islands), H.I.G. Capital Partners II, L.P., H.I.G. Investment Group II, L.P., H.I.G. Capital, LLC, Thomas Barr, and Fleet Capital Corporation, later settled or were otherwise dropped from the suit.

Although Sagaponack, this time joined by Weisman, again moved to dismiss for lack of personal jurisdiction, the motion was summarily denied.

The parties later cross-moved for summary judgment on Plaintiffs' breach of contract and fraudulent transfer claims based, in critical part, on their divergent constructions of the relevant agreements as they relate to Plaintiffs' priority in payment vis-a-vis other TestAmerica creditors. The court denied Defendants' motions and granted Plaintiffs' motion in part with respect to TestAmerica's breach of contract counterclaim.

The case was tried to a jury for six days between February 7 and 16, 2005. Notably, Sagaponack and Weisman did not renew their objections to personal jurisdiction in the joint pretrial report or in their motion for judgment as a matter of law following the close of Plaintiffs' case in chief, which the district court held over until the conclusion of trial. At the close of all the evidence, the district court denied in part and granted in part Defendants' joint Rule 50(a) motion for judgment with respect to several of Plaintiffs' claims, including all those asserted individually by Mullins for failure to show damages. Faraway's remaining claims for fraud and breach of contract by TestAmerica and for fraudulent transfer against all Defendants were submitted to the jury.

Regarding Faraway's breach of contract claim, the jury, over TestAmerica's objection, was instructed that TestAmerica had the burden of proving that Faraway had agreed to be subordinated to all of TestAmerica's other creditors and found the burden was not met. It further concluded that TestAmerica breached its contractual obligations by failing to make the prescribed interest and principal payments under the Agreements, and by failing to provide Faraway with a "Period Income Statement" as required under the Note and the Purchase Agreement. The jury also found that TestAmerica had committed fraud by misrepresenting to Faraway the creditors to which the Note would be subordinated. Additionally, the jury concluded that each of Defendants

had fraudulently transferred assets in violation of TUFTA § 24.005(a)(1), that Weisman and Sagaponack were "insiders," and that neither Weisman nor Sagaponack had taken assets from Fleet in good faith and for a reasonably equivalent value. The jury assessed punitive damages of $400,000, $500,000 and $1,000,000 against Weisman, TestAmerica, and Sagaponack, respectively, based on the fraudulent transfer, and an additional $350,000 in punitives against TestAmerica for fraud. No instructions were given, and thus no findings were made, regarding Faraway's actual damages for any of its claims.

Following a post-trial hearing, the district court partially reconsidered its previous ruling on Defendants' Rule 50(a) motion, granting judgment in favor of Weisman on the fraudulent transfer claim because Faraway had not shown that Weisman received any portion of the funds that Fleet directed HIG to pay Sagaponack. The court refused to award actual damages against TestAmerica but adjudged TestAmerica and Sagaponack to be jointly and severally liable for the $3,202,800 fraudulently transferred to Sagaponack. The court also entered judgment in favor of Faraway on the breach of contract claim in the amount of $3,249,734.42, the principal amount set at arbitration plus annual interest at the contractual rate of 8% calculated from December 31, 1999. Since Faraway represented that it suffered no injury from TestAmerica's breach of its obligations to provide a Period Income Statement apart from attorneys' fees, the court awarded no actual damages, although it nonetheless entered judgment in Faraway's favor on that claim. To preclude a double recovery, the court limited TestAmerica's individual liability for breach of contract to the remaining difference between the amount fraudulently transferred and the $3,249,734.42 due under the Note. Finally, the court entered judgment in accordance with the jury verdict in favor of Faraway on the punitive damage award for the fraud claim, but no actual damages were awarded.

TestAmerica and Sagaponack timely appealed the judgment with respect

to Faraway's claims for breach of contract, fraudulent transfer and punitive damages, and the dismissal of TestAmerica's counterclaim on summary judgment. Faraway cross-appealed the district court's grant of judgment as a matter of law to Weisman on the fraudulent transfer claim.

After the case was fully briefed and orally argued to this panel, we identified deficiencies in the pleadings regarding the citizenship of Sagaponack and remanded the case to the district court. See generally Mullins v. TestAmerica Inc., 300 F. App'x 259 (5th Cir. 2008) (unpublished opinion) (per curiam). On remand, Sagaponack disclosed the citizenships of all its partners both as of the date of removal and the date of Plaintiffs' second amended complaint pleading Sagaponack back into the suit. Based on these new disclosures, the district court concluded that diversity jurisdiction was proper. After amending the notice of removal and the complaint to incorporate the details pertaining to Sagaponack's citizenship, the parties re-filed their appeal and cross-appeal, which, pursuant to this court's previous order, was reassigned to this panel.

## III. Discussion

### A. Diversity jurisdiction

We briefly revisit the issue of subject matter jurisdiction that was raised sua sponte on initial appeal. TestAmerica, a Delaware corporation with its principal place of business in North Carolina, is clearly diverse from Plaintiffs, who are Texas citizens. But as noted in our previous opinion, neither the original notice of removal nor the second amended complaint "distinctly and affirmatively alleged" the citizenship of all of Sagaponack's partners, general and limited. Mullins, 300 F. App'x at 259 (internal quotation marks and citation omitted). This information was crucial to determining whether complete diversity existed. See Carden v. Arkoma Assocs., 494 U.S. 185, 187 (1990). Although we declined to allow amendment on appeal of the parties' pleadings to

cure this deficiency, we remanded the case to the district court to permit supplementation of the record and to make findings regarding the parties' citizenship. Mullins, 300 F. App'x at 261.

The district court, after evaluating Sagaponack's undisputed disclosures, concluded that the parties are diverse. Plaintiffs' newly-amended complaint reflects, and the parties agree, that Sagaponack's citizenship as of December 16, 2003 is that of its sole general partner, RSP Capital, LLC, and 31 limited partners: 16 individuals, 6 corporations, 3 trusts, 4 general partnerships, a limited partnership, and a limited liability company. After applying the appropriate tests for citizenship to these individuals and entities,[6] and further tracing their citizenships down the various organizational layers where necessary, the district court deemed Sagaponack to be a citizen of California, Colorado, Delaware, Florida, Illinois, New Jersey, Massachusetts, Michigan, Nevada, New York, Pennsylvania, Canada, the British Virgin Islands, and Israel. Because none of Sagaponack's partners is a citizen of Texas, we agree with the district court that diversity jurisdiction exists.

## B. Personal jurisdiction

Sagaponack first contends that the judgment against it on Faraway's claim under TUFTA § 24.005(a)(1) must be reversed because Sagaponack lacked the requisite contacts with Texas to support personal jurisdiction. Weisman also asserts that the district court lacked personal jurisdiction over him, but as an alternative basis for affirming the take-nothing judgment in his favor below with respect to the § 24.005(a)(1) claim against him. Based on our review of the

---

[6] See 28 U.S.C. § 1332(c)(1) (corporation is a citizen of the states of its incorporation and its principal place of business); Navarro Savs. Ass'n v. Lee, 446 U.S. 458, 464 (1980) (citizenship of a trust is that of its trustee); Harvey v. Grey Wolf Drilling Co., 542 F.3d 1077, 1080 (5th Cir. 2008) (citizenship of an LLC is that of all its members); Int'l Paper Co. v. Denkmann Assocs., 116 F.3d 134, 135, 137 (5th Cir. 1997) (citizenship of a general partnership depends on that of all partners); Coury v. Prot, 85 F.3d 244, 249 (5th Cir. 1996) (citizenship of an individual is synonymous with his domicile).

record, and for the reasons that follow, we conclude that specific jurisdiction over both defendants exists because Sagaponack and Weisman purposefully aimed their conduct at Faraway in Texas by actively procuring for Sagaponack $3,202,800 of the proceeds from the 2003 sale of TestAmerica to HIG, with the knowledge that their conduct would allegedly impair the rights of a single, major creditor and Texas resident under agreements that center around Texas.

1.      Standard of review

We review the district court's exercise of personal jurisdiction de novo. See Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V., 249 F.3d 413, 417–18 (5th Cir. 2001). A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the Due Process Clause of the Fourteenth Amendment. "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008). To satisfy the requirements of due process, the plaintiff must demonstrate: "(1) that the non-resident purposely availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the state; and (2) that the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" Id. (quoting Wilson v. Belin, 20 F.3d 644, 647 (5th Cir. 1994)).

"Jurisdiction may be general or specific." Stroman Realty, Inc. v. Wercinski, 513 F.3d 476, 484 (5th Cir. 2008). Specific jurisdiction exists when the plaintiff's claim against the non-resident defendant arises out of or relates to activities that the defendant purposefully directed at the forum state. Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 215 (5th Cir. 2000) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S. Ct. 2174 (1985)). In contrast, general jurisdiction requires the defendant to have maintained "continuous and

systematic" contacts with the forum state. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415–16, 104 S. Ct. 1868 (1984).

The parties' briefs conspicuously fail to address an important threshold question, namely, if and how procedural anomalies in Sagaponack's and Weisman's litigation of the jurisdictional question affect the evidentiary standard under which the district court's jurisdictional ruling must be assessed. After Faraway amended its complaint to replead Sagaponack into the suit, Sagaponack and Weisman jointly moved to dismiss for lack of jurisdiction pursuant to FED. R. CIV. P. 12(b)(2). The district court denied that motion without conducting an evidentiary hearing, impliedly concluding that the allegations in the complaint, together with the affidavits and other documentation, demonstrated a prima facie case of personal jurisdiction over both defendants. See Johnston, 523 F.3d at 609 (explaining that a plaintiff need only make a prima facie showing of personal jurisdiction if the district court rules on the issue without an evidentiary hearing). This adverse jurisdictional ruling at the pre-trial stage did not foreclose either defendant from holding Faraway to its ultimate burden at trial of establishing contested jurisdictional facts by a preponderance of the evidence. See Travelers Indem. Co. v. Calvert Fire Ins. Co., 798 F.2d 826, 831 (5th Cir. 1986) ("'Whatever degree of proof is required initially, a plaintiff must have proved by the end of trial the jurisdictional facts by a preponderance of the evidence.'" (quoting Forsythe v. Overmyer, 576 F.2d 779, 781 (9th Cir. 1978))), modified on other grounds, 836 F.2d 850 (5th Cir. 1988). However, neither Sagaponack nor Weisman pressed its jurisdictional defense at any later point in the proceedings below. No mention of the defense is made in either defendant's summary judgment motion, the joint pretrial order, motion for judgment as a matter of law at the close of Faraway's case, response to Faraway's post-trial motion for judgment, or in Sagaponack's renewed motion under FED. R. CIV. P. 50(b) after entry of final

judgment. Neither defendant objected to the district court's statement in its final judgment that "it had jurisdiction over the subject matter and the parties to this proceeding"—that is, not until this appeal.

Several decisions, including an unpublished decision from this court, have held that a defendant's failure to renew an objection to personal jurisdiction following the district court's denial of a Rule 12(b)(2) motion to dismiss either forecloses the defendant's right to invoke the higher burden of proof otherwise applicable to jurisdictional facts established at trial, or waives the objection entirely.[7] We would likewise be inclined to find that Sagaponack and Weisman's wholesale failure to pursue their jurisdictional challenge beyond the 12(b)(2) stage, at a minimum, limits us to determining whether the record at that time demonstrated a prima facie case of personal jurisdiction. But several factors counsel against our application of such a rule in this case. First and foremost, Faraway does not recognize, let alone argue, that either defendant's litigation of its jurisdictional defense affects the applicable evidentiary burden or our ability to review the district court's denial of the joint motion to dismiss. We also find significant that Faraway's brief relies almost entirely on the evidence presented at trial and the jury's finding of liability under TUFTA § 24.005(a)(1) to substantiate personal jurisdiction over Weisman. Faraway similarly refers to the jury's finding that "Sagaponack's receipt of money from HIG was . . . a

---

[7] See Beagles & Elliott Enters., LLC v. Fla. Aircraft Exch., Inc., 70 F. App'x 185, 187 (5th Cir. 2003) (unpublished summary disposition) (viewing the omission of the personal jurisdiction issue from the joint pretrial order, coupled with the parties' stipulation that "[t]here are presently no pending jurisdictional issues," as a concession of personal jurisdiction by the defendant); Peterson v. Highland Music, Inc., 140 F.3d 1313, 1319 (9th Cir. 1998) (limiting appellate review to "the issue that [the defendants] actually contested below: whether or not plaintiffs made out a prima facie case for personal jurisdiction, and whether the district court was correct in denying the motion to dismiss"); Rice v. Nova Biomed. Corp., 38 F.3d 909, 915 (7th Cir. 1994) (refusing to allow the defendant to rely on evidence presented at trial in support of his arguments against personal jurisdiction, when no affidavit or other evidence was presented in connection with his Rule 12(b)(2) motion to dismiss, which was correctly denied).

fraudulent transfer" in support of its argument that jurisdiction over Sagaponack was proper. We construe these references as an implied concession that the entire record is relevant to resolving the jurisdictional question. Under these circumstances, we deem Faraway to have waived any objection to these defendants' failure to preserve their jurisdictional challenge and, accordingly, will review the entire record to determine whether Faraway established by a preponderance of the evidence that Sagaponack and Weisman possessed the requisite contacts with Texas to confer personal jurisdiction.

2. Personal jurisdiction over Sagaponack

We first address whether the district court properly exercised personal jurisdiction over Sagaponack with respect to Faraway's TUFTA claim, which stems from Sagaponack's receipt of a portion of the proceeds from TestAmerica's sale to HIG. Faraway, invoking the "effects" test from Calder v. Jones, 465 U.S. 783 (1984), contends that specific jurisdiction exists because Sagaponack's conduct amounts to an intentional tort intended or highly likely to harm Faraway in its state of residence. Although Faraway advances alternative arguments in support of jurisdiction, we find this issue dispositive.

Under Calder, "an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." Guidry v. U.S. Tobacco Co., 188 F.3d 619, 628 (5th Cir. 1999) (citing Calder, 465 U.S. 783, 789–90 (1984)). Calder involved a suit brought by a California actress in a California state court against two Florida employees of a tabloid magazine based on an allegedly libelous article featured in one of its issues. 465 U.S. at 785–86. The Supreme Court concluded that the defendants, who wrote and edited the article, knew that its injurious effects would be felt by plaintiff in California and had therefore "expressly aimed" their intentional and allegedly tortious conduct

at the forum state. Id. at 789–90. Critically, the focal point of the article itself was also California, since it was drawn primarily from California sources and pertained to an actress whose career was centered in California. Id. at 788–89. Thus, "[t]he key to Calder is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum." Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 869 (5th Cir. 2001) (per curiam) (internal quotation marks and citation omitted).

We are skeptical of Faraway's suggestion that a non-resident defendant's receipt of assets transferred with an intent to hinder, delay, or defraud a creditor ipso facto establishes personal jurisdiction in the state where a complaining creditor resides. The "effects" test in Calder does not supplant the need to demonstrate minimum contacts that constitute purposeful availment, that is, conduct by the non-resident defendant that invoked the benefits and protections of the state or was otherwise purposefully directed toward a state resident. See id. at 869. The premise of the fraudulent transfer claim asserted by Faraway, however, "requires only a finding of fraudulent intent on the part of the 'debtor,'" not the transferee. See S.E.C. v. Res. Dev. Int'l, LLC, 487 F.3d 295, 301 (5th Cir. 2007) (discussing TEX. BUS. & COM. CODE ANN. § 24.005(a)(1)). Knowingly accepting a fraudulent transfer may subject a transferee to liability, but such conduct is not necessarily tantamount to committing a wrongful act purposefully aimed at a creditor of the transferor in his state of residence. Even with libel claims such as that addressed in Calder, we do not presume that the tortious act itself categorically satisfies the requirement of purposeful availment. See Fielding v. Hubert Burda Media, Inc., 415 F.3d 419, 425–26 (5th Cir. 2005) (requiring a "case-by-case" analysis of the nexus between the forum state, the subject matter, and sources of the allegedly defamatory article).

Moreover, any creditor of the transferor may challenge the transferor's transfer as fraudulent, and the resulting injury would ordinarily be felt in the

creditor's state of residence. Under Calder, however, "the plaintiff's residence in the forum, and suffering of harm there, will not alone support [personal] jurisdiction." Revell v. Lidov, 317 F.3d 467, 473 (5th Cir. 2002). We are thus doubtful that personal jurisdiction exists over the recipient of a fraudulent transfer anywhere a complaining creditor files suit simply by virtue of the creditor's residence in that forum. We need not resolve this question, however, primarily because Sagaponack has not argued that asserting personal jurisdiction in this case would potentially subject it to jurisdiction in any forum where a TestAmerica creditor happens to reside, but also because the evidence in this case demonstrates both that Faraway was no ordinary creditor of TestAmerica, and Sagaponack was far from a passive transferee.

TestAmerica's debt to Faraway was sizeable. As established at arbitration, TestAmerica owed $2,233,102.80 in principal on the Note. Of TestAmerica's $50 million in total outstanding debt in 2003, approximately $32.6 million was owed to the Senior Creditors. The Note therefore accounted for roughly 13% of TestAmerica's non-senior debt. But among all of TestAmerica's creditors mentioned in the record, Faraway was the only one who received no share of the proceeds from TestAmerica's sale to HIG. This was the case even though Sagaponack, who obtained $3,202,800 from the HIG Transaction was, like Faraway, an unsecured and non-senior creditor of TestAmerica. Thus, we are presented with a case in which the distribution of funds which gave rise to the challenged transfer singled out for denial of payment a specific, major creditor of the transferor.

Sagaponack's imprimatur on the challenged transfer is also unmistakable. As of 2003, Sagaponack was TestAmerica's majority shareholder that, through its limited partners Weisman and Rosenstein, controlled half of the four-member board of directors that approved the HIG transaction. As Sagaponack concedes, Weisman acted on Sagaponack's behalf when he negotiated an agreement with

Fleet to direct HIG's payment to Sagaponack of approximately $3.2 million that Fleet would otherwise have been entitled to receive. This arrangement was effected through Sagaponack's contractual power to block TestAmerica's sale, coupled with its agreement to provide post-transfer services and to indemnify HIG. Thus, the very transfer underlying Faraway's claim was engineered by Sagaponack.

Sagaponack, through its insider status and conduct, clearly knew of TestAmerica's agreements with Faraway and consistently asserted that its own loans had priority. According to Mullins's uncontroverted testimony, Tom Barr told him that Sagaponack would block any sale (inferentially, by exercising its contractual veto power) that included a distribution to Faraway. Weisman, as Sagaponack's representative, also conducted the meeting in Cleveland at which Mullins was purportedly told that his right to payment was subordinated to that of Sagaponack. For jurisdictional purposes, we do not opine on the merits of the parties' relative priority. However, Sagaponack's conduct manifests that it was acutely aware of TestAmerica's significant debt to Faraway under agreements that allegedly entitled Faraway to payment upon TestAmerica's sale and nonetheless obtained for itself a share of the proceeds to which Faraway claims a superior right.

Given Sagaponack's level of involvement with the challenged transfer, we find particularly persuasive the analysis of Calder's "effects" test as applied to tortious interference with contract claims. In that context, we determine whether the alleged tortfeasor expressly aimed his out-of-state conduct at the forum state by examining the nexus between the forum and the injured contractual relationship. See Cent. Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376, 383–84 (5th Cir. 2003) (holding that the defendant shipper's awareness of and interference with a contractual relationship between two Texas-based companies whose business relationship centers around Texas and

that resulted in harm to plaintiff in Texas supported personal jurisdiction in Texas); Panda Brandywine Corp., 253 F.3d at 869–70 (affirming dismissal for lack of personal jurisdiction in Texas when the financing agreements with which the defendant allegedly interfered "are not governed by Texas law, are not to be performed in Texas, and have no relation to Texas other than the fortuity that Appellants reside there"); Southmark Corp. v. Life Investors, Inc., 851 F.2d 763, 772–73 (5th Cir. 1988) (rejecting specific jurisdiction under Calder when the injured contractual relationship was negotiated outside the forum, contemplated no performance in the forum, was not governed by the law of the forum state, and pertained to the sale of stock of a company that had no connection with the forum).

Sagaponack allegedly thwarted Faraway's right to payment from TestAmerica as provided under contracts governing the sale of METCO, a Texas company, that were executed by Faraway in Texas, where Faraway resides. Additionally, the Note and Purchase Agreement are expressly governed by Texas law. Thus, the debtor-creditor relationship between TestAmerica and Faraway is centered in Texas. Cf. Panda Brandywine Corp., 253 F.3d at 869; Southmark Corp., 851 F.2d at 772–73. Utilizing its veto authority over the HIG transaction, and with full awareness of the Note, Sagaponack purposefully aimed its conduct at Faraway in Texas by ensuring that a portion of its own notes would be paid while knowing that Faraway's would not. It is therefore no "mere fortuity" that Sagaponack's conduct would cause injury to Faraway in Texas. See Cent. Freight Lines, 322 F.3d at 384. Under these circumstances, we find that Sagaponack should reasonably have anticipated being haled into a Texas court for precipitating and directing an alleged fraudulent transfer at the expense of a known, major creditor in Texas whose right to payment arises out of contracts that share a strong connection with Texas.

Finally, Sagaponack has not asserted, let alone made a "compelling case,"

that assertion of personal jurisdiction would offend traditional notions of fair play and substantial justice. Burger King, 471 U.S. at 477, 105 S. Ct. 2174; see also Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 215 (5th Cir. 1999). Accordingly, we conclude that the district court properly exercised personal jurisdiction over Sagaponack with respect to Faraway's fraudulent transfer claim.

### 3. Personal jurisdiction over Weisman

For the same reasons, we likewise find that the preponderance of evidence at trial demonstrates that specific jurisdiction over Weisman for his alleged commission of a fraudulent transfer is proper. The intentional conduct of Sagaponack discussed above and that was directed at Faraway's contractual relationship with TestAmerica was effected through Weisman. It was Weisman who represented Sagaponack on TestAmerica's board, had direct knowledge of the Note, asserted to Mullins Sagaponack's alleged priority over the Note, threatened to veto any sale of METCO that allowed payment to Faraway, and ultimately obtained for Sagaponack the proceeds from TestAmerica's sale that underlie Faraway's fraudulent transfer claim. Without opining on the merits, we conclude that Weisman's alleged conduct in engineering a transfer that knowingly impaired the rights of a Texas resident under agreements centered in Texas substantiates that he purposefully aimed his intentionally tortious conduct at the forum state. Accordingly, the district court properly exercised personal jurisdiction over Weisman with respect to Faraway's fraudulent transfer claim.

## C. Faraway's state law claims

Moving to the merits, TestAmerica challenges the district court's denial of its Rule 50 motion for judgment as a matter of law on Faraway's breach of contract claims and on the punitive damages imposed for fraud, and both TestAmerica and Sagaponack appeal the denial of their Rule 50 motion on

Faraway's fraudulent transfer claim under TUFTA § 24.005(a). Faraway, in turn, appeals the district court's grant of judgment as a matter of law on its fraudulent transfer claim against Weisman.

1.    Standard of review

"We review a district court's ruling on a Rule 50(a) motion for judgment as a matter of law de novo." Delano-Pyle v. Victoria County, 302 F.3d 567, 572 (5th Cir. 2002). "In evaluating such a motion, the court must consider all of the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury." Price v. Marathon Cheese Corp., 119 F.3d 330, 333 (5th Cir. 1997). That said, the court "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (internal quotation marks and citation omitted).

2.    Breach of contract

Pursuant to the jury's verdict, the district court adjudged TestAmerica liable in the amount of $3,249,734.42—the principal amount of $2,233,102.80 as established at arbitration and stipulated by the parties at trial, plus 8% interest accrued from December 31, 1999 through August 2, 2006—for breaching its obligations to Faraway under the Agreements by failing to make annual interest payments after December 31, 2000 and annual principal payments starting December 31, 2001. The district court also adjudged TestAmerica to have breached its contractual obligation under the Note and Purchase Agreement to provide Faraway a Period Income Statement on March 31, 2002, but awarded no actual damages. We address each aspect of Faraway's contract claim

separately below.

    a.    TestAmerica's payment obligations to Faraway

Two jury findings underlie the district court's judgment on the contract claim that arises from TestAmerica's failure to make the payments to Faraway prescribed under the Agreements. First, the jury, responding to the court's interrogatory instructing that TestAmerica bore the burden of proof on this issue, found that Faraway had not "agreed to be subordinate to all other of TestAmerica's creditors, whether existing at the time" the agreements were signed or thereafter created. Second, the jury found that TestAmerica breached its obligations under the Agreements "by failing to make the interest and principal payments to [Faraway] due and owing under the [A]greement[s]."

TestAmerica contends that the judgment must be reversed because language in the Note and Purchase Agreement subordinating the Note to "prior payment in full of all of TestAmerica's debt facilities" expressly and unambiguously subordinated Faraway's claim to all of TestAmerica's debt, including the debt owed to Sagaponack. Since Sagaponack's loans have undisputedly not been paid in full, TestAmerica asserts that Faraway had no right to payment, regardless of which of the two competing versions of the Subordination Agreement is valid. Faraway, in contrast, argues that Sagaponack's notes cannot have priority over its own unless Sagaponack was a proper party to the Subordination Agreement. Whereas Version 6 of that agreement is signed only by Faraway, as a "Subordinated Creditor," and lists only Faraway in the attached exhibit of permitted payments, both the signature page and exhibit to Version 7 include Sagaponack. Faraway thus construes the jury's finding that Faraway did not agree to be subordinated to all of TestAmerica's other creditors as a finding that Version 6 of the Subordination Agreement is the authentic agreement. Based on this finding, Faraway asserts that it is subordinated only to TestAmerica's Senior Creditors, and not to

Sagaponack. Faraway additionally asserts that TestAmerica breached its obligations under the Subordination Agreement by failing to make the payments on its Note prescribed in the attached schedule.

When interpreting contracts, courts applying Texas law must strive to ascertain the parties' intent as expressed in the written instrument. See Texas v. Am. Tobacco Co., 463 F.3d 399, 407 (5th Cir. 2006); Matagorda County Hosp. Dist. v. Burwell, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam). "To achieve this object the [c]ourt will examine and consider the entire instrument so that none of the provisions will be rendered meaningless." R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 519 (Tex. 1980). If the wording of the instrument can be given a definite or certain meaning, then it is not ambiguous and must be construed as a matter of law. Cedyco Corp. v. PetroQuest Energy, LLC, 497 F.3d 485, 490 (5th Cir. 2007); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). If, however, "its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration circumstances present when the particular writing was executed, then it is ambiguous and its meaning must be resolved by a finder of fact." Lenape Res. Corp. v. Tenn. Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996). Only when such ambiguity exists may the trier of fact consider evidence extrinsic to the contract to ascertain the parties' intent. See R & P Enters., 596 S.W.2d at 519.

We first address Faraway's contention that TestAmerica's failure to make the principal and interest payments under the Note amounts to a breach of the Subordination Agreement. That agreement prescribes, in relevant part:

2. Subordinated Debt Subordinated to Senior Debt

(a) Notwithstanding any contrary provisions of any instruments or agreements evidencing or relating to Subordinated Debt, [TestAmerica] covenants and agrees, and each holder of Subordinated Debt by its signature hereon likewise covenants and agrees, for the benefit of the holders from time to time of Senior

28

Debt, that all payments of Obligations and Claims in respect of Subordinated Debt shall be subject and subordinate in right of payment, in accordance with the provisions of this Agreement, to the prior payment in full in cash of all Obligations in respect of (1) Designated Senior Debt [i.e., TestAmerica's debt to Fleet] and (2) other Senior Debt. . . .

(b)    Unless and until all Obligations in respect of the Senior Debt have been finally paid in full in cash, and subject to the provisions of this Agreement, including without limitation Section 3, 4 and 5, no direct or indirect payments shall be made on, under or with respect to any Obligations or Claims . . . in respect of any Subordinated Debt except for the payments set forth as Permitted Scheduled Payments on Exhibit 1 hereto.

(emphasis added). "Subordinated Debt" includes the loan agreements between TestAmerica and "each party signing below as a Subordinated Creditor," and "all agreements . . . between [TestAmerica] and Sagaponack." Faraway was the only entity who signed Version 6 (as a "Subordinated Creditor") and was the only holder of Subordinated Debt listed in the attached exhibit. However, the schedule itself is incomplete in that it does not identify Faraway's loan documents, much less include any of the pertinent payment information.

Even assuming, as Faraway contends, that Version 6 of the Subordination Agreement incorporates the payment obligations prescribed in the Note but that are omitted from the exhibit, it is undisputed that TestAmerica defaulted on its obligations to the Senior Creditors in September, 2000. This occurred before the December 31, 2000 due date of TestAmerica's second of three annual interest payments on the Note and well before the prescribed annual payments of principal on the Note were to begin on December 31, 2001. TestAmerica's default triggered the following suspension clause:

4.    Subordination on Default in Senior Debt

No . . . payments by or on behalf of [TestAmerica] shall be made . . . in respect of any Subordinated Debt, . . . (a) if, at the time specified for such payment, (i) there exists . . . a default in the

29

> payment . . . of any Obligation in respect of Senior Debt . . ., and (ii) the Designated Senior Creditor [i.e., Fleet] and the other Senior Creditors shall not have delivered to the holders of Subordinated Debt a written notice of waiver of the benefits of this sentence and consent to the making of payments on Subordinated Debt . . . .

Because the permitted payments under Paragraph 2 were conditioned on TestAmerica's compliance with Paragraph 4, the latter provision prohibited TestAmerica from making further payments on the Note while it was in default to the Senior Creditors. Moreover, no evidence in the record indicates that any of the Senior Creditors permitted TestAmerica to make payments on Faraway's Note notwithstanding the default.

While conceding that TestAmerica's default in September, 2000 suspended its payment obligations on the Note, Faraway nonetheless contends that the suspension period terminated upon one of three events: (1) TestAmerica's waiver of the suspension clause through its quarterly payments on debt to the Mishus during the default period; (2) Fleet's forbearance agreement with TestAmerica in November, 2001 in which Fleet and two syndicate lenders agreed to refrain temporarily from foreclosing on their security interest in all of TestAmerica's assets; and (3) TestAmerica's satisfaction of its debts to the Senior Creditors upon the company's sale to HIG on January 3, 2003.

We readily reject Faraway's initial contention that TestAmerica waived the suspension period by making quarterly payments to the Mishus during the period of default. The Mishus were not parties to the Subordination Agreement. Hence, their secured loans were not "Subordinated Debt" whose payments were prohibited by the suspension clause. We find no evidence of conduct by TestAmerica manifesting an intent to relinquish its right to invoke the suspension clause, and its payment of debt not subject to the Subordination Agreement is not inconsistent with its reliance on the agreement's suspension clause to cease payments on the Note. See Sun Exploration & Prod. Co. v.

Benton, 728 S.W.2d 35, 37 (Tex. 1987) (explaining that waiver requires either "the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right").

Faraway's characterization of the November, 2001 forbearance agreement as an event that terminated the suspension period relies on language in Paragraph 4 stating that the suspension period "shall end upon the occurrence of a Proceeding or indefeas[i]ble payment in full of the Senior Debt," at which time "any Subordinated Debt which, but for the suspension, would have become and would then be due and payable shall become immediately due and payable subject to the provisions of this Agreement." (emphasis added). The agreement defines a "Proceeding" as "any insolvency, bankruptcy, receivership, liquidation, reorganization, readjustment, arrangement, composition or other similar proceeding relating to [TestAmerica], its property or its creditors." (emphasis added). Faraway asserts that Fleet and the two other syndicate lenders "readjusted" or "arranged" a debt related to TestAmerica's property within the meaning of a "Proceeding" by agreeing not to immediately foreclose on their security interest in TestAmerica's assets.

We disagree with Faraway's characterization of the forbearance agreement as a "readjustment" or "arrangement" that amounts to a "Proceeding" under the Subordination Agreement. These words must be construed consistently with the magnitude of the other terms enumerated in the definition of a "Proceeding." See In re Katrina Canal Breaches Litig., 495 F.3d 191, 218 (5th Cir. 2007) ("Under the canon of ejusdem generis, 'where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated.'" (quoting In re Biloxi Casino Belle Inc., 368 F.3d 491, 500 (5th Cir. 2004))). As used here, a "readjustment" or "arrangement" contemplates a comprehensive agreement with all of TestAmerica's creditors,

31

comparable to an insolvency, bankruptcy, receivership, liquidation, or reorganization proceeding. A "readjustment" in the insolvency context refers to a "[v]oluntary reorganization of a financially troubled corporation by the shareholders themselves, without a trustee's or a receiver's intervention." BLACK'S LAW DICTIONARY 1291 (8th ed. 2004). No such reorganization is contemplated by Fleet's agreement to delay foreclosure. Whereas an "arrangement" with creditors may generally include an "agreement . . . for the . . . extension of time for payment of debts," id. at 116, the scope of the other enumerated terms convinces us that the extension granted to TestAmerica by Fleet and other syndicate lenders regarding a single secured debt is insufficiently comprehensive to constitute an "arrangement" as used in the definition of "Proceeding."[8] We therefore conclude that the November, 2001 forbearance agreement did not terminate the suspension period.

TestAmerica's debts to the Senior Creditors were, however, paid off upon the company's sale to HIG on January 3, 2003. As TestAmerica concedes, this "indefeas[i]ble payment in full" of the Senior Debt terminated the suspension period. The parties argue about the significance of the payment of the Senior Debt on the payment obligations under Paragraph 2(b) of the Subordination Agreement. But the key provision of the Subordination Agreement is the last sentence of Paragraph 4, "any Subordinated Debt which, but for such suspension, would have become and would then be due and payable shall become immediately due and payable subject to the provisions of [the Subordination] Agreement." This means that a large portion of TestAmerica's debt to Faraway, interest and principal payments due before January 3, 2003, became due and

---

[8] We find no support in the trial record for Faraway's assertion that the forbearance agreement was executed to allow TestAmerica time "to pay debt other than Senior Debt." The agreement itself was not submitted into evidence, and the only testimony regarding its execution was that of Tom Barr, who merely stated that Fleet and the syndicate lenders under Fleet's secured loan agreement were allowing TestAmerica some time to get its finances in order and to resume its payments.

payable on that date, subject to another provision of the Subordination Agreement which we discuss below.[9]

We turn now to the impact of TestAmerica's unpaid debt to Sagaponack on Faraway's right to payment. Following the distribution of the sale proceeds among the Senior Creditors and other creditors of TestAmerica, and taking into account that Fleet shared $3,202,800 of its portion of the proceeds with Sagaponack, TestAmerica still owed more than $6 million on Sagaponack's unsecured loans. Thus, to resolve whether TestAmerica's failure to make payments to Faraway on or after January 3, 2003 breached the Subordination Agreement or the other Agreements, we must ascertain whether TestAmerica's undisputed outstanding debt to Sagaponack suspended its payment obligations to Faraway. If, as TestAmerica contends, its obligation to pay on the Note has not matured because Sagaponack's notes have priority, then TestAmerica would not have breached any of the Agreements by failing to pay Faraway on or after TestAmerica's sale. But if Faraway had priority over Sagaponack, then TestAmerica's payment obligations would have matured and been breached once TestAmerica's Senior Creditors were paid from the sale proceeds. This would also be true if neither Faraway nor Sagaponack has priority over the other, in which case TestAmerica would be in breach to both these unsecured creditors.

We begin by determining if either of the two competing versions of the Subordination Agreement—whose sole material difference is the exclusion or inclusion of Sagaponack as a signatory and in the exhibit of permitted payments—defines the relative priorities between Faraway and Sagaponack.

---

[9] Faraway alternatively invokes the subrogation provision, Paragraph 7, of the Subordination Agreement and claims that it steps into the shoes of the Senior Debt once that debt was paid off. The subrogation provision is complex, and we would need more than Faraway's single-sentence claim that "[Faraway] should have been paid pursuant to the terms of the subrogation paragraph of the Subordination Agreement as the Senior Creditors were paid in full" to decide whether or how it applies here. Faraway's inadequate briefing waives this claim. See Nichols v. Enterasys Networks, Inc., 495 F.3d 185, 190 (5th Cir. 2007).

Our reading of both versions convinces us that the Subordination Agreement unambiguously declines to establish whether either creditor has priority over the other.

Several provisions compel this conclusion. First, the preamble to both versions of the Subordination Agreement divides TestAmerica's creditors into two categories: the "Subordinated Creditors," i.e., "the parties signing below as Subordinated Creditors," and the Senior Creditors. In declaring the agreement's purpose of "induc[ing] the Senior Creditors to make or continue to make credit available to" TestAmerica, and noting that the covenants of TestAmerica and the Subordinated Creditors under the agreement are "for the benefit of the Senior Creditors," the Subordination Agreement manifests its singular intent to protect the interests of the Senior Creditors. Given this narrow purpose, the Senior Creditors would have no reason to prescribe the order in which TestAmerica's non-senior debts are paid so long as their own loans are satisfied.

Indeed, Paragraph 2, which is the same in both versions, establishes the priority of the Senior Debt over other specified debts of TestAmerica without further delineating the hierarchy amongst those other debts. According to Paragraph 2(a), unless TestAmerica has fully paid its Senior Debt, no "Subordinated Debt" shall be paid. Both versions define "Subordinated Debt" to include the loan agreements between TestAmerica and "each party signing below as a Subordinated Creditor," and "all agreements . . . between [TestAmerica] and Sagaponack." Thus, even under Version 6 of the Subordination Agreement, which Faraway signed as a "Subordinated Creditor" but Sagaponack did not, the Senior Creditors have priority over both Faraway and Sagaponack.

Paragraph 2(b), which references the schedule of permitted payments discussed above, reflects that, notwithstanding their priority to payment, the Senior Creditors allowed TestAmerica to make payments listed in the attached exhibit so long as other provisions of the Subordination Agreement were

34

satisfied. Thus, if Sagaponack were not properly included in the schedule, as Faraway contends, TestAmerica could not have made regular payments on Sagaponack's loan while its Senior Debt remained outstanding without breaching its obligations to the Senior Creditors. The dispute here, however, is not whether TestAmerica violated its duties to the Senior Creditors by paying Sagaponack ahead of Faraway, but whether TestAmerica was required to pay either Sagaponack or Faraway before the other. Nothing in Paragraph 2(b) resolves that issue. Merely listing certain payments in the attached schedule does not suggest their relative priority, nor does it indicate that the listed payments have priority over other non-senior debts not included in the schedule. Whether the schedule of permitted payments includes both Faraway's and Sagaponack's notes, or solely Faraway's, therefore has no bearing on the issue of priority as between these two creditors.

Nor does the satisfaction of TestAmerica's debts to the Senior Creditors upon the 2003 sale to HIG affect our conclusion. Faraway suggests that if it were the only "Subordinated Creditor" under the Subordination Agreement, it alone would be subrogated to the rights of the Senior Creditors to receive payment once their debts were paid. We have declined supra to address Faraway's argument about the subrogation clause in Paragraph 7, but we note that both versions of Paragraph 7 confer a right of subrogation on "the holders of Subordinated Debt." Even if Sagaponack did not sign the agreement, "Subordinated Debt," by definition, includes TestAmerica's debt to Sagaponack. Thus, even assuming that Paragraph 7 confers special rights on Faraway to receive payment after the Senior Debt was satisfied in 2003, it would at best have shared that right with Sagaponack. Which between Faraway and Sagaponack has priority at that juncture, again, is not settled in the agreement.

That the Subordination Agreement does not address Faraway's and Sagaponack's relative priority is all the more apparent when Paragraphs 2 and

35

7 are viewed in conjunction with the following language:

8.   Obligations of [TestAmerica] Unconditional

Nothing contained in this Agreement (a) is intended to or shall impair, as between [TestAmerica] and the holders of Subordinated Debt, the obligations of [TestAmerica], which are absolute and unconditional, to pay to the holders of Subordinated Debt all Obligations in respect of Subordinated Debt as and when the same shall become due and payable in accordance with their terms, or (b) is intended to or shall affect the relative rights of the holders of Subordinated Debt, on the one hand, the creditors of [TestAmerica] other than the holders of Senior Debt, on the other hand.

By disclaiming in Subpart (b) that the agreement has any effect other than establishing the priority of Senior Debt over Subordinated Debt, the Subordination Agreement plainly disavows any intent to place Faraway ahead of or behind Sagaponack in right to payment; both of their notes are "Subordinated Debt."  As Faraway points out, Subpart (a) declares that TestAmerica's payment obligations to pay Faraway and Sagaponack are "absolute and unconditional." But Faraway improperly overlooks the remainder of the clause stating that TestAmerica's payments on Subordinated Debt "shall become due and payable in accordance with their terms."  (emphasis added). Subpart (a) therefore defers to TestAmerica's loan agreements with Faraway and Sagaponack to resolve whether any payments are due and owing.  The relative priorities of these two creditors is simply not addressed.

We conclude as a matter of law that neither version of the Subordination Agreement establishes the priority between TestAmerica's debts to Faraway and to Sagaponack, which leads us to examine whether any terms within the Note and Purchase Agreement resolve this question.  TestAmerica cites the subordination clause in both agreements stating that the Note "shall be subordinated to" and "subject in right of payment to the prior payment in full of all of [TestAmerica's] debt facilities."  Interpreting this clause to subordinate the

Note to all of TestAmerica's debt, TestAmerica asserts that Faraway agreed to be subordinated to Sagaponack. This was the very construction advanced by TestAmerica's counsel below, asserted by TestAmerica's witnesses, and, evidently, rejected by the jury.

We agree with the jury's finding that Faraway did not agree to be subordinated to all of TestAmerica's other debt merely because it agreed to be subordinated to TestAmerica's "debt facilities." A "debt facility" is the flip-side of a "credit facility," the appropriate term when viewing the "facility" from the standpoint of the creditor instead of the debtor. "Credit facilities" generally denote formal agreements to extend credit, typically by a lending institution to a business.[10] Ordinary trade debt, payroll debt, or utility bills, for example, do not constitute debt facilities. Indeed, equating all of TestAmerica's "debt facilities" to all of TestAmerica's "debt" impermissibly renders meaningless the accompanying word, "facility," which clearly restricts the types of debt encompassed by the term. See, e.g., Ill. Tool Works, Inc. v. Harris, 194 S.W.3d 529, 536 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (rejecting an interpretation of an employment contract that "would render parts of the contract superfluous").

Neither the Note nor the Purchase Agreement defines "debt facilities."

---

[10] The definition of "credit facility" varies in substance and scope in several of the sources we have consulted. See, e.g., JERRY M. ROSENBERG, DICTIONARY OF BANKING & FINANCE 146 (1982) (defining "credit facilities" as "a business system set up to offer credit services to those who possess personal or business credit"); P.H. COLLIN, DICTIONARY OF BANKING & FINANCE 59 (1991) (defining "credit facilities" as an "arrangement with a bank or supplier to have credit so as to buy goods"); OXFORD DICTIONARY OF FINANCE & BANKING 147 (3d ed. 2005) (defining a "facility" as "[a]n agreement between a bank and a company that grants the company a line of credit with the bank"); A.S. PRATT & SONS, STRUCTURING & DRAFTING COMMERCIAL LOAN AGREEMENTS ¶ 1.02 (noting that credit facilities are "usually documented by a formal loan agreement" and constitute "a legally binding commitment of the bank," and identifying revolving credit agreements, term loans, revolving credit agreements that convert to a term loan, and evergreen facilities as types of "credit facilities," but specifically excluding a line of credit).

Notably, TestAmerica's contemporaneously-executed loan agreement with Fleet is specifically identified as a "credit facility" and, indeed, fits the mold of a typical credit facility in that Fleet, a bank, agreed to make "available" to TestAmerica a total of $37 million in the form of revolving credit loans, letters of credit, and a $25 million term loan to be paid at regular quarterly intervals. Sagaponack's notes, in contrast, arise in the context of a mixed equity, loan and security agreement executed between TestAmerica and a major shareholder, and one of the three notes merely amends a pre-existing note that dates back to a prior loan transaction. Whether the subordination clause in the Note and Purchase Agreement intended to include Sagaponack's notes as a "debt facility" with priority is therefore unclear, and neither this court nor the district court had any briefing on it. Because TestAmerica's presentation at trial (wrongly) equated "debt facilities" with "all debt," and Faraway (wrongly) maintained that its priority vis-a-vis Sagaponack depended on the terms of the Subordination Agreement, the record contains no testimony or other evidence regarding whether Sagaponack's notes constitute the type of credit agreement intended to be included as a "debt facility" as used in the Note and Purchase Agreement. We therefore cannot discern from this record if Faraway was entitled to be paid on or after the January 3, 2003 sale of TestAmerica to HIG.

The jury may have believed that by finding that Faraway had not agreed to be subordinated to all of TestAmerica's other creditors, it was necessarily concluding that Faraway had not agreed to be subordinated to Sagaponack, since Sagaponack was the sole TestAmerica creditor whose relative priority was at issue. As we have observed, if Sagaponack does not have priority over Faraway, then TestAmerica would have breached its duty to pay the Note, as the jury also found.

Under other circumstances, we might well have been able to affirm the jury's finding that TestAmerica breached the Agreements, but in this case, the

district court also instructed the jury that TestAmerica bore the burden of proving that Faraway was subordinated to Sagaponack under the Agreements because it deemed the issue of subordination to be an affirmative defense. TestAmerica argues that this instruction improperly relieved Faraway of its burden of proving that TestAmerica breached these agreements by failing to pay, a contention that it preserved by properly and specifically raising it during the charge conference below.[11]

"An affirmative defense allows the defendant to introduce evidence to establish an independent reason why the plaintiff should not prevail; it does not rebut the factual proposition of the plaintiff's pleading." Hassell Constr. Co. v. Stature Commercial Co., 162 S.W.3d 664, 667 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (emphasis added); see also Tex. Beef Cattle Co. v. Green, 921 S.W.2d 203, 212 (Tex. 1996) (noting that mere denial of a plaintiff's claims is not an affirmative defense). For example, recognized affirmative defenses to breach of contract such as modification,[12] failure of consideration,[13] statute of

---

[11] We agree with Faraway that the wording of TestAmerica's proposed jury instruction on the issue of subordination is consistent with its treatment as an affirmative defense upon which TestAmerica would bear the burden of proof. We also acknowledge that TestAmerica in its answer prophylactically pleaded the subordination clause as an affirmative defense. But at the subsequent charge conference, TestAmerica specifically objected to the burden of proof in the district court's charge on precisely the same grounds that it asserts now on appeal. See FED. R. CIV. P. 51(c)(1) (noting that a party preserves its claim of error in the jury instructions by objecting to the instruction on the record and specifying the reasons for the objection). TestAmerica's objection sufficiently preserved this question for our review.

[12] Intec Sys., Inc. v. Lowrey, 230 S.W.3d 913, 918 (Tex. App.—Dallas 2007, no pet.).

[13] Suttles v. Thomas Bearden Co., 152 S.W.3d 607, 614 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

frauds,[14] ratification,[15] material breach,[16] and duress[17] either admit or do not engage the plaintiff's allegations of breach but assert other, independent facts as a basis for negating liability that the defendant must plead and prove.

The dispute surrounding the effect of the subordination clause differs qualitatively from these defenses. To establish a breach of the Agreements, Faraway was required to prove that TestAmerica was obligated to and failed to meet its payment obligations. See Sears, Roebuck & Co. v. AIG Annuity Ins. Co., 270 S.W.3d 632, 637 (Tex. App.—Dallas 2008, pet. filed) ("The plaintiff in any breach of contract case bears the burden of proving the breach."). Because Faraway agreed to make the Note "subject in right of payment to the prior payment in full" of all of TestAmerica's "debt facilities," TestAmerica's failure to make the prescribed payments constitutes a breach only if TestAmerica's outstanding debt to Sagaponack was not a "debt facility" that had priority. Cf. id. at 637 (holding that the plaintiff investors who challenged the defendant's redemption of bonds prior to their maturity date bore the burden of proving that the defendant had no right to redeem them, since their redemption "was a breach only if the requirements for redemption had not been met"). TestAmerica's invocation of the subordination clause attempts to negate Faraway's allegations of breach by directly attacking the factual assertion that TestAmerica was required to pay under the Agreements. See, e.g., James M. Clifton, Inc. v. Premillenium, Ltd., 229 S.W.3d 857, 859–60 (Tex. App.—Dallas

---

[14] Wilkerson v. Pic Realty Corp., 590 S.W.2d 780, 782 (Tex. Civ. App.—Houston [14th Dist.] 1979, no writ).

[15] Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc., 609 S.W.2d 754, 756 (Tex. 1980).

[16] Compass Bank v. MFP Fin. Servs., Inc., 152 S.W.3d 844, 852 (Tex. App.—Dallas 2005, pet. denied).

[17] Firemen's Fund Ins. Co. v. Abilene Livestock Auction Co., 391 S.W.2d 147, 149 (Tex. Civ. App.—Dallas 1965, writ ref'd n.r.e.).

2007, no pet.) (holding that the defendant's "position that it was not obligated by the Agreement to pay [the plaintiff] is not a matter of avoidance; it need not be pleaded as an affirmative defense").[18]  Thus, TestAmerica's insistence that the Note is subordinated to Sagaponack's loans is not an independent basis for non-liability that qualifies as an affirmative defense.

In fact, we construe the subordination language making the Note "subject to" payment in full of TestAmerica's debt facilities as a condition precedent to TestAmerica's duty to pay Faraway.  "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." Centex Corp. v. Dalton, 840 S.W.2d 952, 956 (Tex. 1992).  Texas courts construe language such as "if," "provided that," "on condition that," or similar phrases to condition performance of a promise upon the occurrence of a prescribed event. See Criswell v. European Crossroads Shopping Ctr., Ltd., 792 S.W.2d 945, 948 (Tex. 1990); Hohenberg Bros. Co. v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976).  The phrase, "subject to" is also sufficiently conditional to create a condition precedent.  See Cedyco Corp., 497 F.3d at 488–89 (offering to sell a working interest in two oil wells "subject to a[ ] consent to assign" by the original lessee made the consent of the lessee a condition precedent to the formation of a contract under Texas law); Shaw v. Kennedy, Ltd., 879 S.W.2d 240, 246 (Tex. App.—Amarillo 1994, no writ) (construing the obtaining of a release as a condition precedent because the defendant's obligations were "subject to" obtaining the release).

---

[18]  We find Faraway's attempt to distinguish Clifton unpersuasive.  In that case, because the terms of the contract required the defendant to pay an entity other than the plaintiff, the court concluded that the plaintiff had failed to establish a breach of the agreement stemming from defendant's failure to make payments to plaintiff, and that the defendant's denial of that obligation was not a matter of avoidance that must be pleaded or proved as an affirmative defense. Clifton, 229 S.W.3d at 859.  It did not, as Faraway contends, address the validity of the contract, and, indeed, the recited facts make evident that the parties had a valid contract. Id. at 858.

The Note and Purchase Agreement contain the requisite conditional language making the terms of the Note, and thus TestAmerica's obligations thereunder, "subject to" TestAmerica's payment of all its "debt facilities." Both agreements make prior payment of TestAmerica's "debt facilities" a condition precedent to TestAmerica's payment obligations to Faraway under those agreements. Since the alleged "debt facility" at issue is TestAmerica's outstanding debt to Sagaponack, Faraway bears the burden of proving that Sagaponack did not have to be paid in full before TestAmerica's obligations to Faraway would mature.[19] See Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 283 (Tex. 1998) ("A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied.").

We therefore conclude that the district court erred by requiring TestAmerica to prove that the Note was subordinated to Sagaponack's loans. Although misallocating the burden of proof might be harmless in some instances, see, e.g., Whiteside v. Gill, 580 F.2d 134, 139 (5th Cir. 1978) (observing that such error might be harmless where, for example, the evidence is "so clear that the allocation of the burden of proof would make no difference"), such is not the case here, when we find the record has conflicting evidence on whether Faraway agreed to be subordinated to the payment of Sagaponack's loans. Accordingly,

---

[19] We recognize that one of our prior decisions treated a condition precedent as an affirmative defense for which the defendant bears the burden of proof. See Tex. Dep't of Housing & Cmty. Affairs v. Verez Assurance, Inc., 68 F.3d 922, 928 (5th Cir. 1995) ("To succeed with the affirmative defense of conditions precedent, the defendant must establish (1) that the contract creates a condition precedent, and (2) that the condition precedent was not performed."). However, this directly contradicts the Texas Supreme Court's later decision in Associated Indemnity, which expressly requires the party asserting breach to prove that a condition precedent is satisfied. 964 S.W.2d at 283. We therefore conclude that the statement of Texas law in Texas Department of Housing is incorrect and is not binding precedent in this Circuit. See Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc., 55 F.3d 181, 185 (5th Cir. 1995) (declining to adhere to a prior panel decision that is "'clearly contrary'" to subsequent state appellate decisions); Farnham v. Bristow Helicopters, Inc., 776 F.2d 535, 537 (5th Cir. 1985) ("In diversity cases . . . we are to follow subsequent state court decisions that are clearly contrary to a previous decision of this court.").

we must vacate the judgment to the extent it declared TestAmerica to have breached its payment obligations to Faraway and remand this contract claim for further proceedings.

      b.     TestAmerica's obligation to provide a "Period Income Statement"

TestAmerica additionally challenges the legal sufficiency of the evidence supporting the jury's finding that TestAmerica breached its obligation to provide Faraway a "Period Income Statement" as required under the Note and Purchase Agreement. Faraway wholly fails to address this contention in its brief, and, more importantly, sought no finding by the jury or the district court regarding its actual damages based on this claim. Even assuming that TestAmerica's delivery of the Period Income Statement one day after the prescribed deadline amounts to a breach, Faraway was required to prove that TestAmerica's conduct caused actual damages to establish its breach of contract claim. See Lewis v. Bank of Am. NA, 343 F.3d 540, 544–45 (5th Cir. 2003) (concluding that the district court erred by submitting a Texas common-law contract claim to the jury when there was no proof of damages suffered as a result of the breach); James L. Gang & Assocs., Inc. v. Abbott Labs., Inc., 198 S.W.3d 434, 439 (Tex. App.—Dallas 2006, no pet.) (affirming grant of summary judgment to defendant on breach of contract claim for which the plaintiff failed to submit competent evidence substantiating its damages); Barr v. AAA Tex., LLC, 167 S.W.3d 32, 35–36 (Tex. App.—Waco 2005, no pet.) (affirming a take-nothing judgment on a breach of contract action based on the insufficiency of evidence supporting damages); Harris v. Am. Protection Ins. Co., 158 S.W.3d 614, 622–23 (Tex. App.—Ft. Worth 2005, no pet.) (affirming the trial court's refusal to submit a breach of contract claim to the jury in the absence of evidence that the plaintiff suffered any damages). The record contains no evidence substantiating any injury to Faraway as a result of the untimely delivery of the Period Income

Statement. Because Faraway failed to submit legally sufficient evidence substantiating its actual damages, we must reverse the district court's judgment on this breach of contract claim.

3.    Fraudulent transfer

a.    Faraway's claim against TestAmerica and Sagaponack

TestAmerica and Sagaponack challenge the district court's judgment voiding the transfer to Sagaponack of $3,202,800 of the proceeds received from TestAmerica's sale to HIG pursuant to the jury's finding that both defendants violated TUFTA § 24.005(a)(1), holding both defendants jointly and severally liable up to that amount, and entering the jury's award of punitive damages of $1 million and $500,000 against Sagaponack and TestAmerica, respectively. Both defendants assert that TUFTA, by definition, does not apply to the money allocated to Sagaponack because those funds came out of Fleet's rightful share of the sale proceeds and were encumbered by Fleet's security interest in all of TestAmerica's assets.

> The relevant provision of TUFTA states:
>
> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) (emphasis added). Under TUFTA, a "transfer" means disposing of or parting with an "asset." § 24.002(12). The statute defines an "asset" in turn, as "property of a debtor," but expressly excludes "property to the extent it is encumbered by a valid lien." § 24.002(2)(A). A "valid lien" is defined as "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." § 24.002(13). A "lien" includes a security interest. § 24.002(8). Together, these

definitions exempt from TUFTA an alleged fraudulent transfer of property to the extent that such property is encumbered by a security interest that would be effective against a subsequent judicial lien. Pursuant to the jury instructions, which Faraway does not challenge, Faraway bore the burden of proving that the money received by Sagaponack as part of TestAmerica's sale to HIG was subject to TUFTA.

The uncontroverted evidence reflects that as of January 3, 2003, the date of TestAmerica's sale to HIG, TestAmerica had $50 million in outstanding debt, well more than the agreed sale price of $33.5 million. At that time, Fleet was owed at least $26,336,585.64 on its loans to TestAmerica and held a "lien" in the form of a security interest in all of TestAmerica's assets. In rejecting the defendants' renewed motion for judgment as a matter of law, the district court misinterpreted the definition of a "valid lien" under TUFTA by limiting it to "a judicial lien obtained through a legal or equitable process." But to constitute a "valid lien," a lien need only be effective against a subsequent judicial lien. § 24.002(13). Faraway presented no evidence that Fleet's security interest in all the assets of TestAmerica would not have priority over any later-acquired judicial lien on those assets, and, indeed, does not dispute on appeal that Fleet held a "valid lien" within the meaning of TUFTA.[20] We conclude that the

---

[20] Notably, a security interest in collateral has priority over subsequent judicial liens only if the interest was perfected by filing an appropriate financing statement. See, e.g., Grocers Supply Co. v. Intercity Inv. Props., Inc., 795 S.W.2d 225, 226–27 (Tex. App.—Houston [14th Dist.] 1990, no writ) (collecting cases from other Uniform Commercial Code Article 9 jurisdictions and following this super-majority rule that confers priority on the holder of a prior-perfected security interest over a judgment creditor); 9 ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9-301:15 ("A security interest perfected by filing prevails over a subsequent judgment lien . . . ."). Although TestAmerica's loan documents with Fleet obligated TestAmerica to file the requisite financing statements to perfect Fleet's security interest, we find no evidence in the trial record substantiating that those statements were actually filed. However, under the jury instructions—which Faraway does not challenge—Faraway bore the burden of proving that the money given to Sagaponack was a "transfer" subject to TUFTA. To meet its burden, Faraway was required to prove that the $26,336,585.64 in proceeds from TestAmerica's sale to HIG was an "asset" over which Fleet did not hold a security interest with

45

$26,336,585.64 in proceeds from TestAmerica's sale to HIG was encumbered by Fleet's "valid lien" and was therefore not an "asset" within the meaning of TUFTA. See, e.g., Yokogawa Corp. of Am. v. Skye Int'l Holdings, Inc., 159 S.W.3d 266, 269 (Tex. App.—Dallas 2005, no pet.) (holding the enforcement of a security interest through foreclosure and sale of the debtor's property was not a voidable transfer of an "asset" under TUFTA).

Faraway instead asserts that Fleet's lien did not extend to the $3,202,800 of the proceeds that Fleet directed HIG to pay to Sagaponack because Fleet entered into an "accord and satisfaction" with TestAmerica by agreeing to forego that portion and to release its lien. In its January 2, 2003 pay-off letter to HIG, Fleet agreed to accept a discounted payment of $23,133,785.64 instead of the full $26,336,585.64 it was owed. As part of that agreement, Fleet directed HIG to pay the remaining "Allocated Amount" of $3,202,800 to Sagaponack "[i]n consideration for (a) the consent of Sagaponack . . . to the Sale and (b) Sagaponack's agreement to cooperate and assist with certain post-closing matters arising from and in connection with the Sale . . . ." The letter expressly acknowledged "that but for the agreement of [Fleet] to share with Sagaponack the proceeds of the assets that were granted as collateral . . . under the terms of its [Loan Agreement], [Fleet] would be entitled to receipt of the Allocated Amount in its entirety." In consideration for HIG's payment of Fleet's discounted loan, Fleet agreed to release its security interests "upon receipt" of payment on the day of closing.

Faraway's treatment of the $3.2 million allocated to Sagaponack as exempt from Fleet's lien assumes that the disbursement of funds occurred in two distinct and independent steps: (1) an "accord and satisfaction" between TestAmerica

---

priority over a later judicial lien. Because no evidence at trial suggests that Fleet did not properly perfect its security interest in TestAmerica's assets, we conclude that Fleet held a "valid lien" exempt from TUFTA.

and Fleet under which Fleet accepted less than it was owed and extinguished its lien; and (2) a later transfer of the remaining, unencumbered $3.2 million to Sagaponack. For Fleet's acceptance of less than the full amount owed to constitute an "accord and satisfaction," however, the debt owed by TestAmerica to Fleet must have been disputed or unliquidated. See Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 863 (Tex. 2000) ("A valid accord and satisfaction requires that there initially be a legitimate dispute between the parties about what was expected" (internal quotation marks and citation omitted)); Ind. Lumbermen's Mut. Ins. Co. v. State, 1 S.W.3d 264, 266 (Tex. App.—Ft. Worth 1999, pet. denied) (requiring for a valid accord and satisfaction that there be either a disputed or an unliquidated debt); 1 TEX. JUR. 3D ACCORD AND SATISFACTION § 25. The uncontroverted evidence shows that neither of these requirements is satisfied because, on the date of TestAmerica's sale, it owed Fleet the undisputed and liquidated amount of $26,336,585.64. See Am. Gen. Life Ins. Co. v. Copley, 428 S.W.2d 862, 865 (Tex. Civ. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.) ("Where there is an undisputed obligation to pay a liquidated amount, an agreement to pay and to accept a lesser amount is not a valid accord because it is not supported by sufficient consideration."). Thus, Fleet made no enforceable commitment to receive less than the full sum to which it was entitled under its loans to TestAmerica. Its lien therefore encompassed the entire $26,336,585.64.

Moreover, the economic realities of the agreement reached between Fleet and Sagaponack reflect that Fleet's acceptance of a discounted payment of $23 million and its allocation of $3.2 million to Sagaponack are inextricable components of an integrated transaction involving assets wholly secured by Fleet's valid lien. During the eighteen months following TestAmerica's default on its loans, Fleet had threatened to force TestAmerica into bankruptcy. As TestAmerica's counsel testified at trial, TestAmerica's liquidation value in

bankruptcy would be substantially less than the amount that could be obtained in the normal course of business, such as HIG's offer to buy TestAmerica's assets for $33.5 million. But because of Sagaponack's contractual change-of-control provision, the sale to HIG could not occur without Sagaponack's consent. Because its security interest extended to the $26 million owed on its loan, Fleet had the authority to dictate how that sum would be distributed. Wanting to maximize the amount recouped on its loans, Fleet was willing to give up part of its rightful share to ensure Sagaponack's cooperation and to consummate the sale. It is therefore improper to treat Fleet's acceptance of $23 million as a settlement or "accord and satisfaction" of TestAmerica's debt to Fleet that freed the remaining $3.2 million to pay other creditors, when Fleet effectuated its recovery by specifically and contemporaneously agreeing to pay Sagaponack part of its share. Contrary to Faraway's contentions, both the pay-off letter and the testimony of Fleet's representative at trial establish that Fleet did not release its lien until after it received payment following the close of the sale.

Had the January 2, 2003 pay-off letter specified that Fleet would receive the full $26 million from HIG and then disburse $3.2 million of those proceeds to Sagaponack, the entire amount would unquestionably be exempt from TUFTA as an asset wholly encumbered by Fleet's valid lien. The only difference here is that Fleet agreed to settle its loan to TestAmerica by accepting the lesser amount of $23 million at the same time as it directed HIG to pay the remaining $3.2 million directly to Sagaponack, an arrangement that merely eliminated Fleet as the intermediary. We see no substantive difference between these two scenarios; under both, Fleet's entitlement to the full $26 million means that the entire sum was subject to its security interest, including the portion that Fleet allocated to Sagaponack. Because the $3,202,800 paid to Sagaponack was encumbered by a "valid lien," it was not an "asset" under TUFTA. Therefore, no "transfer" occurred, and Faraway's fraudulent transfer claim under TUFTA

48

§ 24.005(a)(1) fails as a matter of law.

We reject Faraway's alternative contention that the money transferred to Sagaponack violates TUFTA § 24.005(a) in spite of Fleet's valid lien. Faraway relies on TUFTA § 24.005(b)(11), which lists a debtor's transfer of "essential assets of the business to a lienor who transferred the assets to an insider of the debtor" as one of several badges of fraud that can support a finding of fraudulent intent under § 24.005(a)(1). TEX. BUS. & COM. CODE ANN. § 24.005(b)(11) (emphasis added). However, that statute is subject to the definitional provisions of TUFTA excluding the debtor's disposition of property encumbered by a "valid lien." See TEX. BUS. & COM. CODE ANN. § 24.002 (listing the definitions that apply to all other provisions of TUFTA). When construed together with these definitions, § 24.005(b)(11) provides that a transfer from a debtor to a "lienor" to an insider can substantiate fraudulent intent, but only if the "lienor" does not hold a "valid lien" exempt from the definition of an "asset" under TUFTA. This could occur, for example, if the circumstances surrounding the lien's creation are themselves part of the alleged fraudulent transfer, see, e.g., Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd., 80 S.W.3d 601, 609 (Tex. App.—Houston [1st Dist.] 2002, no pet.), or if the lien would not have priority over a subsequent judicial lien so as to constitute a "valid lien" as defined by TUFTA. But when, as here, the disputed property is encumbered by a "valid lien," it is not an "asset" subject to avoidance, and the transferor's intent in disposing of the asset is irrelevant. See, e.g., Webster Indus., Inc. v. Northwood Doors, Inc., 320 F. Supp. 2d 821, 836 (N.D. Iowa 2004) ("[I]f there is no 'asset' involved, the intent of the parties to the [putative fraudulent] transfer is irrelevant.").

In sum, we conclude as a matter of law that Fleet's allocation of a $3,202,800 payment to Sagaponack from the proceeds of TestAmerica's sale did not constitute a "transfer" subject to TUFTA. Accordingly, we reverse the district court's judgment on Faraway's fraudulent transfer claim against

Sagaponack and TestAmerica.

b.    Faraway's claim against Weisman

Faraway cross-appeals the district court's take-nothing judgment in favor of Weisman on its fraudulent transfer claim against him individually.  Faraway recites three pages of disjointed facts relating to Weisman's participation in the litigation, his relationship with TestAmerica, Sagaponack, and Sagaponack Management, and his involvement in various aspects of the relevant transactions.   Faraway cites no authority supporting its contention that Weisman's involvement with the putative fraudulent transfer and alleged (though unspecified) benefit therefrom suffices to hold him liable under TUFTA, notwithstanding the uncontroverted fact that he never received any portion of the disputed funds.  Accordingly, we deem this issue waived due to inadequate briefing.  See Kohler v. Englade, 470 F.3d 1104, 1114 (5th Cir. 2006) (finding waiver for failure to cite legal authority); FED. R. APP. P. 28(a)(9)(A) (requiring briefs to present contentions "with citations to the authorities and parts of the record" relied upon (emphasis added)).

4.    Exemplary damages for fraud

We also find that the district court's judgment imposing $350,000 in punitive damages against TestAmerica for fraud cannot be sustained.  As TestAmerica points out, "actual damages sustained from a tort must be proven before punitive damages are available."  Twin City Fire Ins. Co. v. Davis, 904 S.W.2d 663, 665 (Tex. 1995); see also Doubleday & Co. v. Rogers, 674 S.W.2d 751, 754 (Tex. 1984) ("The Texas cases are unanimous in holding that recovery of actual damages is prerequisite to receipt of exemplary damages."); TEX. CIV. PRAC. & REM. CODE ANN. § 41.004 (limiting the availability of punitive damages to cases in which "damages other than nominal damages are awarded").  Here, the predicate for punitive damages is not satisfied because no actual damages resulting from TestAmerica's alleged misrepresentation regarding the priority

of the Note were requested or awarded and the only damages potentially available are for breach of contract. Accordingly, we reverse the award of punitive damages for fraud.

D.     TestAmerica's breach of contract counterclaim

TestAmerica lastly contends that the district court erred by dismissing on summary judgment its counterclaim that Faraway breached the Subordination Agreement by filing suit during the suspension period. We review the grant of summary judgment de novo, applying the same standard as the district court below. Coury v. Moss, 529 F.3d 579, 584 (5th Cir. 2008). Summary judgment is proper when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

In Texas, "[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." Aguiar v. Segal, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). The parties do not dispute the validity of the Subordination Agreement.

Regarding Faraway's breach, the Subordination Agreement expressly prohibits "the holders of Subordinated Debt" from "commencing any Proceeding, or tak[ing] any action to demand or enforce payment of any Subordinated Debt" while TestAmerica was in default to its obligations to the Senior Creditors. TestAmerica undisputedly defaulted on its obligations to Fleet in September, 2000, and, as explained above, the suspension period did not end until the Senior Creditors were paid from the proceeds of TestAmerica's January 3, 2003 sale to HIG. Faraway, as a holder of "Subordinated Debt," clearly violated its obligation to refrain from enforcing or demanding payment on the Note by filing suit on December 31, 2001, while the suspension period remained in effect.

Finally, Faraway itself submitted summary judgment evidence

51

substantiating that TestAmerica had incurred attorneys' fees during the suspension period as a result of Faraway's premature filing of suit, although the precise amount was disputed. This evidence alone suffices to raise a genuine issue of material fact that Faraway's breach caused actual damages. See, e.g., Thomas v. Great Atl. & Pac. Tea Co., 233 F.3d 326, 329 (5th Cir. 2000) (noting that "[w]hen reviewing a grant of summary judgment, we must review the record as a whole" (emphasis added)).

Based on the evidence in the summary judgment record, a reasonable jury could find in favor of TestAmerica on each essential element of its breach of contract counterclaim. See, e.g., E. & J. Gallo Winery v. Spider Webs Ltd., 286 F.3d 270, 274 (5th Cir. 2002) (noting that summary judgment is proper only "[i]f no reasonable juror could find for the non-movant" (internal quotation marks and citation omitted)). We therefore reverse the district court's grant of partial summary judgment on TestAmerica's counterclaim.

## IV. Conclusion

Our conclusions render unnecessary any further litigation of Faraway's breach of contract claim predicated on TestAmerica's failure to deliver timely a Period Income Statement, Faraway's fraud claim against TestAmerica, and Faraway's TUFTA claim against TestAmerica, Sagaponack, and Weisman. Further, in the litigation that remains, the question of which version of the Subordination Agreement controls (which consumed so much of the trial) is irrelevant. What remains is Faraway's breach of contract claim against TestAmerica based on the failure to pay the Note, specifically the question whether TestAmerica's debt to Sagaponack is a "debt facility" within the meaning of the Note and Purchase Agreement. Also remaining is the issue of damages occasioned by Faraway's breach of the Subordination Agreement by filing suit during the suspension period. We do not suggest that another trial is necessary. We leave that to the district court.

We AFFIRM the district court's grant of judgment as a matter of law and entry of a take-nothing judgment on Faraway's fraudulent transfer claim under TUFTA § 24.005(a)(1) against Weisman. We REVERSE the district court's grant of partial summary judgment on TestAmerica's breach of contract counterclaim. We VACATE the district court's judgment pursuant to the jury verdict (1) on Faraway's contract claims against TestAmerica relating to its payment obligations under the Agreements and duty to provide a Period Income Statement; (2) on Faraway's § 24.005(a)(1) claim against TestAmerica and Sagaponack; and (3) imposing punitive damages against TestAmerica for fraud. We REMAND this case for entry of a take-nothing judgment on the TUFTA claims against TestAmerica and Sagaponack, on the fraud claim against TestAmerica, and on the contract claim for breach of TestAmerica's duty to provide a Period Income Statement, and for further proceedings consistent with this opinion. Each party shall bear its own costs.